**NOT YET SCHEDULED FOR ORAL ARGUMENT**
**Nos. 22-5249, 22-5269 (consolidated)**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**BRIDGEPORT HOSPITAL, dba Yale**
**New Haven Health, et al.,**
*Plaintiffs-Appellees/Cross-Appellants.*
v.

**XAVIER BECERRA, Secretary,**
**Department of Health and Human Services,**
*Defendant-Appellant/Cross-Appellee.*

*On Appeal from the United States District Court*
*for the District of Columbia*
*Civil Action No. 20-cv-1574 (CJN)*

**BRIEF FOR THE APPELLEES/CROSS-APPELLANTS**

KATRINA A. PAGONIS
HOOPER, LUNDY & BOOKMAN, P.C.
44 Montgomery Street, Suite 3500
San Francisco, CA 94104
Tel.: (415) 875-8515
Fax: (415) 986-2157
E-mail: kpagonis@hooperlundy.com

KELLY A. CARROLL
HOOPER, LUNDY & BOOKMAN, P.C.
401 9th Street, N.W., Suite 550
Washington, D.C. 20004-2141
Tel.: (202) 580-7712
Fax: (202) 580-7719
Email: kcarroll@hooperlundy.com

*Attorneys for Appellees/Cross-Appellants*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to Circuit Rule 28(a)(1), Plaintiff-Appellees/Cross-Appellants, 24 hospitals that participate in the Medicare program, by and through their undersigned counsel, hereby certify the following as to Parties, Rulings, and Related Cases:

**A.    <u>PARTIES</u>**

<u>Appellant/Cross-Appellee</u>

Appellant/Cross-Appellee, defendant below, is the Secretary of the United States Department of Health and Human Services, currently Xavier Becerra.

<u>Appellees/Cross-Appellants</u>

Appellees/Cross-Appellants (the "Hospitals"), plaintiffs below, are hospitals that at all times relevant to this action participated in the Medicare program.  The Hospitals include the following: Bridgeport Hospital, d.b.a. Yale New Haven Health; Greenwich Hospital; Lawrence + Memorial Hospital; Yale New Haven Hospital; Westerly Hospital; Emory University Hospital; Dekalb Medical Center, d.b.a. Emory Decatur Hospital; Emory University Hospital Midtown; Saint Joseph's Hospital of Atlanta, Inc., d.b.a. Emory Saint Joseph's Hospital; Dekalb Medical Center at Hillandale; Emory Johns Creek Hospital; Kent County Memorial Hospital; Women & Infants Hospital of Rhode Island; The University of Chicago Medical Center; Ingalls Memorial Hospital; Margaret R. Pardee Memorial

Hospital, d.b.a. Pardee UNC Health Care; Caldwell Memorial Hospital; UNC

Rockingham Health Care; UNC Hospitals; Johnston Health Services Corporation,

d.b.a. Johnston Health; Rex Hospital; Nash Hospitals, Inc.; Milford Regional

Medical Center; Emerson Hospital.

Pursuant to Circuit Rule 26.1, the undersigned certifies that there are no parent

companies or any publicly held company that has a 10 percent or greater

ownership interest in Appellees/Cross-Appellants.

Intervenors and *Amici Curiae*

There are no intervenors or *amici curiae* in this action in this Court to date.

The following entities were *amici curiae* in the District Court: Alabama Hospital

Association, Arkansas Hospital Association, Georgia Hospital Association,

Mississippi Hospital Association, North Carolina Hospital Association, Oklahoma

Hospital Association, and Tennessee Hospital Association.

## B.    RULINGS UNDER REVIEW

The ruling under review is the July 27, 2022 Order (Dkt. No. 38) issued by

the district court (Nichols, Carl J.) in *Bridgeport Hospital v. Becerra,* No. 1:20-cv-

01574-CJN, 2022 WL 4487114 (D.D.C. July 27, 2022), including the district

court's decision of March 2, 2022 (Dkt. No. 29), 589 F. Supp. 3d 1 (D.D.C. 2022),

and all prior orders and decisions that merge into the order of July 27, 2022.

## C.    <u>RELATED CASES</u>

The case on review was before the district court under Case No. 1:20-cv-01574-CJN.  The case was not previously before this Court or any other court.  Counsel are unaware of "any other related case," as defined in Circuit Rule 28(a)(1)(C).  Some overlapping issues and the Appellant are, however, present in *Kaweah Delta Health Care District v. Becerra,* Nos. 23-55157, 23-55209 (9th Cir.).

Dated:  May 3, 2023                 Respectfully submitted,

                                    HOOPER, LUNDY & BOOKMAN, P.C.

                                    By: <u>         /s/ Katrina Pagonis         </u>
                                    KATRINA A. PAGONIS
                                    HOOPER, LUNDY & BOOKMAN, P.C.
                                    44 Montgomery Street, Suite 3500
                                    San Francisco, CA 94104
                                    Tel.: (415) 875-8515
                                    Fax: (415) 986-2157
                                    E-mail:  kpagonis@hooperlundy.com

                                    KELLY A. CARROLL
                                    HOOPER, LUNDY & BOOKMAN, P.C.
                                    401 9th Street, N.W., Suite 550
                                    Washington, D.C.  20004-2141
                                    Tel.: (202) 580-7712
                                    Fax: (202) 580-7719
                                    Email:  kcarroll@hooperlundy.com

                                    *Attorneys for Appellees/Cross-Appellants*

## **TABLE OF CONTENTS**

**Page**

I. Introduction................................................................................1

II. Statement of Jurisdiction .........................................................2

III. Issue Presented for Appeal by Hospitals ...............................3

IV. Statutes and Regulations Involved .........................................4

V. Statement of the Case..............................................................4

    A.      Statutory and Regulatory Background ................................4

         1.    The Medicare Program .................................................4

         2.    The Wage Index ...........................................................5

         3.    Exceptions and Adjustments Authority .......................7

    B.      The Low Wage Index Redistribution and the 0.2016% Payment Reduction in the FY 2020 Proposed and Final Rules .........................8

    C.      The Medicare Appeals Process and Judicial Review.........................16

    D.      The Administrative Procedure Act.......................................17

    E.      Statement of Facts and Prior Proceedings.........................18

VI. Summary of the Argument .....................................................21

VII. Standard of Review ..............................................................25

VIII. Argument...........................................................................25

    A.      The Secretary's Payment Reduction Exceeds His Medicare Act Authority. ...............................................25

         1.    The Low Wage Index Redistribution and the Payment Reduction Violate the Wage Index Statute.............................26

                a.    The Policies Violate the Plain Terms of § 1395ww(d)(3)(E). ...............................26

                b.    The Secretary Placed His Thumb on the Factually-Based Wage Index Scale, Diminishing its Accuracy. ...............................29

                c.    The Low Wage Index Redistribution Uses an Unlawful, Non-Uniform Inflation of Wage Index Values. ...............................33

2.    The District Court Properly Ruled That the Secretary Could Not Impose the Payment Reduction under § 1395ww(d)(5)(I)(i)...................................................34

    a.    The Secretary Cannot Defend the Payment Reduction as a Freestanding Adjustment. ......................34

    b.    The Secretary's Policy Conflicts with Subsection (d)(3)(E) and Could Not Be Adopted Under His Subsection (d)(5)(I) Authority.......................................35

    c.    The Secretary Failed to Comply with the Express Requirements of Subsection (d)(5)(I)............................42

    d.    The Payment Reduction is Not a Permissible Budget Neutrality Adjustment Under Subsection (d)(5)(I)(ii). ...................................................................47

B.    The Secretary's Low Wage Index Redistribution and Payment Reduction Violate the APA..................................................50

    1.    The Low Wage Index Redistribution And Payment Reduction Are Not Rationally Explained. ................................51

    2.    The Secretary Failed To Sufficiently Address Significant Comments. ..................................................................54

C.    The District Court Erred in Failing to Vacate the Payment Reduction and Award Interest.............................................56

    1.    This Court Has Jurisdiction Over the Hospitals' Cross-Appeal. ...................................................................56

    2.    The District Court Erroneously Failed to Vacate the Payment Reduction. ...............................................................59

    3.    As the Undisputed Prevailing Parties, the Hospitals are Entitled to an Award of Interest under the Medicare Act.........63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adirondack Medical Center v. Sebelius,*
   740 F.3d 692 (D.C. Cir. 2014)....................................... 34, 36, 37, 38, 39, 40, 50

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety*
   *Admin.,*
   429 F.3d 1136 (D.C. Cir. 2005)...................................................60, 61

*Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993).......................................................60, 61, 62, 63

*Allina Health Servs. v. Sebelius,*
   746 F.3d 1102 (D.C. Cir. 2014).........................................................60

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
   934 F.3d 649 (D.C. Cir. 2019).............................................................61

*Am. Great Lakes Ports Ass'n v. Schultz,*
   962 F.3d 510 (D.C. Cir. 2020) .....................................................59, 61

*Anna Jacques Hosp. v. Burwell,*
   797 F.3d 1155 (D.C. Cir. 2015)................................................28, 33

*Anna Jaques Hospital v. Sebelius,*
   583 F.3d 1 (D.C. Cir. 2009).............................................................30

*Appalachian Power Co. v. EPA,*
   249 F.3d 1032 (D.C. Cir. 2001).........................................................53

*AT&T Corp. v. Fed. Commc'ns Comm'n,*
   970 F.3d 344 (D.C. Cir. 2020)...................................................46, 47

*Atrium Med. Ctr. v. Sebelius,*
   917 F. Supp. 2d 688 (S.D. Ohio 2013)............................................26

*Atrium Med. Ctr. v. U.S. Dep't of Health & Hum. Servs.,*
   766 F.3d 560 (6th Cir. 2014) ........................................................5, 27

*Banner Health v. Price*,
    867 F.3d 1323, 1349 (D.C. Cir. 2017)................................................................23

*Bennett v. Spear*,
    520 U.S. 154 (1997)................................................................................................25

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)................................................................................................43

*Brock v. Cathedral Bluffs Shale Oil Co.*,
    796 F.2d 533 (D.C. Cir. 1986)..............................................................................46

*Cape Cod Hosp. v. Sebelius*,
    630 F.3d 203 (D.C. Cir. 2011)..........................................................................4, 5

*Centra Health, Inc. v. Shalala*,
    102 F. Supp. 2d 654 (W.D. Va. 2000)..................................................................27

*Checkosky v. SEC*,
    23 F.3d 452 (D.C. Cir. 1994)................................................................................60

*Chem. Mfrs. Ass'n v. EPA*,
    28 F.3d 1259 (D.C. Cir. 1994)..............................................................................53

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)................................................................................................25

*Cnty. of Los Angeles v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 1999).....................................................................42, 57

*Comcast Corp. v. F.C.C.*,
    579 F.3d 1 (D.C. Cir. 2009)..................................................................................63

*Conn. Light & Power Co. v. Nuclear Regul. Comm'n.*,
    673 F.2d 525 (D.C. Cir. 1982)..............................................................................51

*Duncan v. Walker*,
    533 U.S. 167 (2001)................................................................................................46

*E.E.O.C. v. Aramark Corp., Inc.*,
    208 F.3d 266 (D.C. Cir. 2000)..............................................................................51

*EME Homer City Gen., L.P. v. EPA*,
  795 F.3d 118 (D.C. Cir. 2015)............................................................60

*Good Samaritan Hosp. v. Shalala*,
  508 U.S. 402 (1993)..........................................................................4

*Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*,
  706 F.3d 499 (D.C. Cir. 2013)...........................................................59

*Home Box Office Inc. v. FCC*,
  567 F.2d 9, 35–36 (D.C. Cir. 1977)....................................................54

*Humane Soc'y of U. S. v. Jewell*,
  76 F. Supp. 3d 69 (D.D.C. 2014), *aff'd sub nom. Humane Soc'y of
  the U.S. v. Zinke,* 865 F.3d 585 (D.C. Cir. 2017) ...............................59

*Humane Soc'y of the U.S. v. Zinke*,
  865 F.3d 585 (D.C. Cir. 2017)...........................................................60

*Kaweah Delta Health Care District v. Becerra*,
  No. CV 20-6564-CBM-SP(X), 2022 WL 18278175 (C.D. Cal.
  Dec. 22, 2022)............................................... 26, 29, 33, 36, 38, 39, 47

*Methodist Hosp. of Sacramento v. Shalala*,
  38 F.3d 1225 (D.C. Cir. 1994)...........................................................28

*N. Air Cargo v. U.S. Postal Serv.*,
  674 F.3d 852 (D.C. Cir. 2012)...........................................................61

*NAACP v. U.S. Sugar Corp.*,
  84 F.3d 1432 (D.C. Cir. 1996)......................................................24, 56, 57, 58

*Nat'l Wildlife Fed'n v. EPA*,
  286 F.3d 554 (D.C. Cir. 2002)...........................................................46

*Occidental Petroleum Corp. v. SEC*,
  873 F.2d 325 (D.C. Cir. 1989)......................................................56, 57, 58

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety
  Admin.*,
  494 F.3d 188 (D.C. Cir. 2007)...........................................................51

ix

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015)......................................................................54, 55

*Pub. Citizen, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   332 F.3d 654 (D.C. Cir. 2003)............................................................25

*Pueblo of Sandia v. Babbitt*,
   231 F.3d 878 (D.C. Cir. 2000)......................................................56, 58

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012)............................................................................36

*Sarasota Mem'l Hosp. v. Shalala*,
   60 F.3d 1507 (11th Cir. 1995) ...........................................................33

*SAS Inst. Inc. v. Iancu*,
   138 S. Ct. 1348 (2018)........................................................................31

*Shands Jacksonville Med. Ctr. v. Burwell*,
   139 F. Supp. 3d 240 (D.D.C. 2015)....................................7, 34, 50, 61

*Sierra Club v. EPA*,
   356 F.3d 296 (D.C. Cir. 2004)............................................................30

*St. Francis Med. Ctr. v. Azar*,
   894 F.3d 290 (D.C. Cir. 2018)............................................................52

*Stand Up for California! v. U.S. Dep't Interior*,
   879 F.3d 1177 (D.C. Cir. 2018).........................................................61

*In re Surface Mining Regul. Litig.*,
   627 F.2d 1346 (D.C. Cir. 1980).........................................................48

*Tucson Med. Ctr. v. Sullivan*,
   947 F.2d 971 (D.C. Cir. 1991)............................................................64

*U.S. Sugar Corp. v. EPA*,
   830 F.3d 579 (D.C. Cir. 2016)......................................................32, 33

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq*. ............................17, 24, 25,
                                                        44, 50, 51, 52, 60

x

5 U.S.C. § 553 .................................................................17, 18, 54

5 U.S.C. § 553(b) and (c) ..................................................43

5 U.S.C. § 706(2) ..............................................................24, 60

5 U.S.C. § 706(2)(A) .........................................................17, 25, 51

5 U.S.C. § 706(2)(C) ...............................2, 3, 17, 58, 60, 61, 62

5 U.S.C. § 706(2)(D) .........................................................17, 54

28 U.S.C. § 1291 ...............................................................3, 57, 58

28 U.S.C. § 1331 ...............................................................2

28 U.S.C. § 1361 ...............................................................2

Medicare Act, 42 U.S.C. §§ 1395, *et seq.* ...............4, 34, 62, 63

42 U.S.C. § 1395g(d) .........................................................19

42 U.S.C. § 1395hh(a) .......................................................51

42 U.S.C. § 1395oo(a) .......................................................16, 64

42 U.S.C. § 1395oo(a)(2) ...................................................64

42 U.S.C. § 1395oo(b) .......................................................16

42 U.S.C. § 1395oo(f) ........................................................2, 25

42 U.S.C. § 1395oo(f)(1) ...................................................17, 19, 63, 64

42 U.S.C. § 1395oo(f)(2) ...................2, 3, 17, 19, 20, 24, 26, 58, 63, 64, 65

42 U.S.C. § 1395ww(d) ......................................................7

42 U.S.C. § 1395ww(d)(1)-(5) ............................................5

42 U.S.C. § 1395ww(d)(3)(A)(vi) .......................................36, 37, 38, 39

42 U.S.C. § 1395ww(d)(3)(E) ..................1, 2, 5, 6, 7, 9, 11, 12, 15, 21, 25, 26,
28, 29, 32, 33, 34, 35, 38, 39, 43, 44, 45

42 U.S.C. § 1395ww(d)(3)(E)(i)....................................................5, 26, 40

42 U.S.C. § 1395ww(d)(3)(E)(ii) ...........................................................6

42 U.S.C. § 1395ww(d)(3)(E)(ii)–(iv)...................................................40

42 U.S.C. § 1395ww(d)(5)(I) .................... 12, 13, 21, 22, 24, 34, 35, 36, 37, 38, 39, 42, 43, 44, 45, 46, 47, 49, 50, 55

42 U.S.C. § 1395ww(d)(5)(I)(i).............. 7, 22, 34, 35, 36, 39, 41, 43, 44, 47, 50

42 U.S.C. § 1395ww(d)(5)(I)(ii)............................................7, 47, 50

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, § 508 (Dec. 8, 2003) ......................................41

Social Security Act Amendments of 1993 (S. 1668).............................48

Social Security Act Amendments of 1994, Pub. L. 103-432, § 109, 108 Stat. 4398, 4408 (1994)...........................................................49

Transitional Medical Assistance, Abstinence Education and QI Programs Extension Act of 2007, Pub. L. No. 110–90, 121 section 7(b) Stat. 984, 986 (2007)......................................................37, 38, 39

**Other Authorities**

42 C.F.R. § 405.1867 ...........................................................................16

42 C.F.R. Part 412...................................................................................5

42 C.F.R. § 412.64 ...............................................................................45

42 C.F.R. § 412.64(h) ...................................................................9, 15, 27

103 Cong. Rec. S15935 (daily ed. Nov. 17, 1993)...............................49

58 Fed. Reg. 30,222 (May 26, 1993) ...................................................48

58 Fed. Reg. 46,270 (Sept. 1, 1993) ...................................................48

59 Fed. Reg. 45,330 (Sept. 1, 1994) ...................................................49

60 Fed. Reg. 29,202 (June 2, 1995) ....................................................49

60 Fed. Reg. 45,778 (Sept. 1, 1995) ................................................. 50

69 Fed. Reg. 48,916 (Aug. 11, 2004)................................................. 41

69 Fed. Reg. 661 (Jan. 6, 2004) ...................................................... 41

83 Fed. Reg. 20,164 (May 7, 2018) ................................................... 8

84 Fed. Reg. 19,158 (May 3, 2019) ................................. 8, 9, 10, 12, 15, 43, 44, 53

84 Fed. Reg. 42,044 (Aug. 16, 2019)...................... 6, 10, 11, 12, 13, 14, 15, 18, 24,
27, 28, 30, 34, 35, 43, 44, 45, 46, 52, 55, 64

84 Fed. Reg. 53,603 (Oct. 8, 2019)...................................................... 11

85 Fed. Reg. 58,432 (Sept. 18, 2020) ................................................. 18

85 Fed. Reg. 78,748 (Dec. 7, 2020) ................................................... 18

86 Fed. Reg. 44,774 (Aug. 13, 2021).................................................. 18

86 Fed. Reg. 58,019 (Oct. 20, 2021).................................................. 18

87 Fed. Reg. 48,780 (Aug. 10, 2022)............................................. 18, 41, 46

88 Fed. Reg. 26,658 (May 1, 2023) ................................................... 18

Dep't of Health & Human Servs., Off. Gen. Couns., Advisory Op. 20-
05 on Implementing *Allina* (Dec. 3, 2020),
https://www.hhs.gov/sites/default/files/allina-ao.pdf ................................. 46, 47

Fed. R. App. P. 4(a)(3)................................................................... 3

H.R. Rep. No. 115-862 (2018)........................................................... 8

# GLOSSARY OF ABBREVIATIONS

APA            Administrative Procedure Act

Board          Provider Reimbursement Review Board

FY             Federal Fiscal Year

JA             Joint Appendix

Secretary      Secretary of the U.S. Department of Health and Human Services

# I. <u>INTRODUCTION</u>

The district court correctly concluded that the Secretary of Health and Human Services ("Secretary") unlawfully cut Medicare inpatient hospital payments for Federal Fiscal Year ("FY") 2020 (the "Payment Reduction"), including payments to Appellees/Cross-Appellants, 24 Medicare-participating hospitals ("Hospitals"). The Secretary adopted the Payment Reduction to fund his unprecedented and counterfactual inflation of wage index values for one-in-four hospitals (the "Low Wage Index Redistribution"), in direct violation of Congress's mandate that Medicare payments be adjusted <u>based on relative hospital wages</u> under 42 U.S.C. § 1395ww(d)(3)(E). As a result of the policy, the Secretary underpaid the Hospitals approximately $3.6 million in FY 2020. JA 4.

In an effort to fit his policy within the confines of his subsection (d)(3)(E) authority, the Secretary (at 34) mischaracterizes the Low Wage Index Redistribution as an exercise of his "predictive judgment[]" to correct for wage index distortions. Not so. The Low Wage Index Redistribution simply inflates one-in-four wage index values in disregard of actual labor market conditions. Therefore, this policy distorts the wage index so that it no longer reflects actual relative wage differences, in disregard of Congress's clear mandate. Moreover, the Secretary cannot invoke his exceptions and adjustments authority to save his

1

policy—to do so "would gut the specific statutory provisions in place to calculate the wage index."  JA 78.

Despite properly concluding that the Payment Reduction exceeds the Secretary's statutory authority under § 1395ww(d)(3)(E) and § 1395ww(d)(5)(I) such that the policy cannot be rehabilitated on remand through further explanation or otherwise, the district court erroneously declined to vacate the Payment Reduction pursuant to 5 U.S.C. § 706(2)(C).  Additionally, the district court erred in failing to award the Hospitals interest as prevailing parties, as required under 42 U.S.C. § 1395oo(f)(2).

For these reasons, this Court should affirm the portion of the district court's decision setting aside the Payment Reduction, and (1) expressly vacate the challenged 0.2016% payment reduction and (2) award interest to the Hospitals pursuant to 42 U.S.C. § 1395oo(f)(2).

## II. <u>STATEMENT OF JURISDICTION</u>

The Hospitals invoked the jurisdiction of the district court under 42 U.S.C. § 1395oo(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1361, after obtaining a grant of expedited judicial review from the Provider Reimbursement and Review Board ("Board").  The district court granted the Hospitals' summary judgment motion in part and denied the Secretary's cross-motion for summary judgment on March 2,

2

2022.  JA 80.  On July 27, 2022, the district court entered a "final appealable order" remanding the matter to the Secretary for further proceedings.  JA 88.

After the Secretary filed a timely notice of appeal (JA 89), the Hospitals filed a timely notice of cross-appeal on October 10, 2022.  JA 90; Fed. R. App. P. 4(a)(3).  This Court has jurisdiction over the appeal and cross-appeal under 28 U.S.C. § 1291.

The Secretary's November 14, 2022 Motion to Dismiss contested this Court's jurisdiction over the Hospitals' cross-appeal.  The parties submitted briefing thereon and, on January 24, 2023, a motions panel of this Court issued an order referring the motion to dismiss to the merits panel.  Order (Jan. 24, 2023). The Hospitals address this Court's jurisdiction over their cross-appeal *infra*, pp. 56–59.

### III. <u>ISSUE PRESENTED FOR APPEAL BY HOSPITALS</u>

The Hospitals' cross-appeal presents the following issues:

1.    Whether the district court, after concluding that the challenged agency action "must be set aside because it conflicts with Congress's statutory directive" (JA 79) erred by not vacating the challenged 0.2016% payment reduction as required under 5 U.S.C. § 706(2)(C).

2.    Whether the district court erred by failing to award interest to the Hospitals as the prevailing parties pursuant to 42 U.S.C. § 1395oo(f)(2).

3

## IV. <u>STATUTES AND REGULATIONS INVOLVED</u>

Pertinent statutes and regulations are in the Addendum filed herewith.

## V. <u>STATEMENT OF THE CASE</u>

**A.    <u>Statutory and Regulatory Background</u>**

    1.    <u>The Medicare Program</u>

Medicare is a federally funded health-insurance program for the elderly and disabled. *See* Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* (the "Medicare Act"). Under a "complex statutory and regulatory regime," *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993), the Secretary, through the Centers for Medicare & Medicaid Services, pays participating hospitals for inpatient care they provide to Medicare beneficiaries.

In 1983, Congress directed the Secretary to implement an inpatient prospective payment system. *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011). Under this system, a hospital receives a fixed payment—set in advance—for treating a Medicare patient, regardless of how much the hospital actually spends on that patient (subject to certain exceptions not relevant here). *Id*. In general, payments are calculated by adjusting a base payment rate (or "standardized amount") to account for geographic factors (including wage differences), the diagnosis of the patient determined at the time of discharge, and

4

other factors. *Id.* at 205–06; *see generally* 42 U.S.C. § 1395ww(d)(1)-(5); 42

C.F.R. Part 412.

    2.   <u>The Wage Index</u>

    Although the Medicare Act is complex, the wage index provisions are

"relatively straightforward." *Atrium Med. Ctr. v. U.S. Dep't of Health & Hum.

Servs.*, 766 F.3d 560, 564 (6th Cir. 2014). Congress requires the Secretary to

account for regional variations in labor costs by determining "the proportion of the

standardized amount attributable to wages and wage-related costs and then

multipl[ying] that labor-related proportion by a wage index that reflects the relation

between the local average of hospital wages and the national average of hospital

wages." *Cape Cod Hosp.*, 630 F.3d at 205 (quotations removed); *see also* 42

U.S.C. § 1395ww(d)(3)(E). By statute, the Secretary must implement this

adjustment "for area differences in hospital wage[s]" with the wage index, which is

"a factor . . . reflecting the relative hospital wage level in the geographic area of the

hospital compared to the national average hospital wage level." 42 U.S.C.

§ 1395ww(d)(3)(E)(i). A wage index value that is higher than 1.00 indicates an

area has a higher wage level than the national average, and a value that is lower

than 1.00 indicates an area that has a lower wage level than the national average.

    The Secretary must "update" the wage index annually "on the basis of a

survey conducted by the Secretary (and updated as appropriate) of the wages and

wage-related costs" of Medicare hospitals, and the annual update generally may not increase aggregate inpatient payments (*i.e.*, must be budget neutral).  42 U.S.C. § 1395ww(d)(3)(E).  The Secretary updates the wage index using data from hospitals' annual Medicare cost reports as well as occupational mix survey responses.  84 Fed. Reg. 42,044, 42,304–09 (Aug. 16, 2019) ("FY 2020 Final Rule").  The raw data is verified during a 15-month "wage index development process," *see* 84 Fed. Reg. at 42,324–25, and he addresses erroneous or aberrant data by using "proxy data" as needed, *see id.* at 42,309.  The Secretary uses this data to determine an "average hourly wage" for each labor market area, which is compared against an average hourly wage for all hospitals nationally to produce the wage index.  *See* 84 Fed. Reg. at 42,305.

On occasion, Congress has implemented legislative solutions to specific wage index issues.  Effective beginning in FY 2005, Congress capped the labor-related share at 62% for hospitals whose payments are decreased by the wage index (*i.e.*, hospitals with wage index value less than 1.00).[1]  42 U.S.C. § 1395ww(d)(3)(E)(ii).  Congress subsequently amended the statute to add clause (iii), which requires the Secretary to apply a wage index value of not less than 1.00 for hospitals in "frontier states" beginning in FY 2011.  Most recently, Congress

---

[1] For example, in FY 2020, low wage index hospitals had only 62% of their payments reduced by the wage index rather than the full labor-related share of 68.3%.  84 Fed. Reg. at 42,325.

6

added clause (iv), instructing the Secretary to apply an imputed rural floor in certain "all-urban" states beginning in FY 2022.

Importantly, Congress requires the Secretary to implement these solutions in a non-budget neutral fashion, *id.* at § 1395ww(d)(3)(E)(i), (iv)(III), such that other hospitals do not subsidize the resulting increased payments to specified hospitals.

### 3.    Exceptions and Adjustments Authority

In addition to authorizing the Secretary to make adjustments that account for area wages and other specified factors, the Medicare Act, at 42 U.S.C. § 1395ww(d)(5)(I)(i), generally authorizes the Secretary to "provide by regulation for such other exceptions and adjustments to such payment amounts under [42 U.S.C. § 1395ww(d)] as the Secretary deems appropriate."  Importantly, this "provision does not give the Secretary *carte blanche* to override the rest of the Act."  *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 260 (D.D.C. 2015).

The subsequent clause, at 42 U.S.C. § 1395ww(d)(5)(I)(ii), explicitly addresses the Secretary's authority to adopt budget neutrality adjustments but limits that authority to adjustments for transfer cases.  No such authority exists for exceptions or adjustments for non-transfer cases under subsection (d)(5)(I)(i).

7

**B.**     **The Low Wage Index Redistribution and the 0.2016% Payment Reduction in the FY 2020 Proposed and Final Rules**

*1.*     In the proposed rule for FY 2020, the Secretary stated there was a growing disparity between low and high wage index hospitals. *See* 84 Fed. Reg. 19,158, 19,393–95 (May 3, 2019) ("FY 2020 Proposed Rule"). After summarizing public comments received in response to a Request for Public Comments on Wage Index Disparities included in the prior year's proposed rule, 83 Fed. Reg. 20,164, 20,372 (May 7, 2018) ("FY 2019 Proposed Rule"), the Secretary found that "some current wage index policies create barriers to hospitals with low wage index values from being able to increase employee compensation due to the lag between when hospitals increase the compensation and when those increases are reflected in the calculation of the wage index." 84 Fed. Reg. at 19,394–95. Importantly, the Secretary cited no study or other analysis that supported his contention that hospital wage levels are driven by the wage index rather than market forces, and he did not respond to comments "indicat[ing] that further analysis and study are needed," 84 Fed. Reg. at 19,394.[2]

---

[2] In connection with a bill that was not passed, the House Committee on Appropriations likewise considered requiring the Secretary to "analyze data" and solutions in a report to Congress. H.R. Rep. No. 115-862, at 89 (2018). The Secretary (at 12–13) cites to this portion of the congressional record for the first time in his brief, but it is not part of his rulemaking record, and he does not suggest the Secretary considered it.

8

With respect to the data lag claim, the Secretary acknowledged that "this lag results from the fact that the wage index calculations rely on historical data." *Id.* at 19,395. But reliance on historical data is both universal and a direct result of Congress's wage index statute, which requires using "a survey . . . of the wages and wage related costs" of Medicare hospitals. 42 U.S.C. § 1395ww(d)(3)(E); *see also* 42 C.F.R. § 412.64(h) (implementing regulation requiring the area wage index to be "based on survey data"). Moreover, the Secretary <u>did not dispute</u> that the wage index values for higher and lower wage hospitals were based on <u>actual, agency-vetted wage data</u>, nor did he suggest the wage data failed to accurately capture hospital wage levels, as Congress requires.

Ignoring commenters' calls for studies and analysis, the Secretary proposed to inflate the wage index values for certain low wage index hospitals, making the wage index less accurate by secretarial fiat. Specifically, the Secretary proposed to identify those hospitals with wage index values in the lowest quartile and then to inflate their wage index values by half the difference between the (a) the actual wage index value as calculated by the Secretary per the Hospital Wage Index Development process and (b) the 25th percentile of wage index values. *See* 84 Fed. Reg. at 19,395.[3]

---

[3] The Secretary explained his inflationary formula as follows: If Hospital A's wage index value is 0.6663, the Secretary would apply a wage index value that

(footnote continued)

The Secretary further proposed to implement this <u>counterfactual</u> Low Wage Index Redistribution in a budget neutral manner through a corresponding reduction to the wage index values of the highest quartile wage index hospitals.  84 Fed. Reg. at 19,395–96.  The Secretary sought to justify this unlawful proposed redistribution through two blindingly obvious assertions that provide no rationale for ignoring the congressional requirement of a uniform, data-driven wage index: (a) "by compressing the wage index for hospitals on the high and low ends . . . such a methodology increases the impact on existing wage index disparities more than by simply addressing one end," and (b) "such a methodology ensures those hospitals in the middle . . . do not have their wage index values affected by this proposed policy."  *Id.* at 19,395.  Although the Secretary discussed alternatives to the proposed budget neutrality adjustment, including "applying a budget neutrality factor to the standardized amount rather than focusing the adjustment on the wage index of high wage index hospitals," *id.* at 19,672, none was proposed.

  *2.*  In the FY 2020 Final Rule, the Secretary acknowledged that "some commenters have presented reasonable policy arguments that we should consider further regarding the relationship between our proposed budget neutrality adjustment targeting high wage hospitals and the design of the wage index to be a

is 0.6663 plus one-half of the difference between 0.6663 and the 25th percentile wage index value of 0.8482 (*i.e.*, 0.7573).  84 Fed. Reg. at 42,326.

relative measure of [hospitals'] wages and wage-related costs." 84 Fed. Reg. at

42,331. Based on this feedback, the Secretary decided "not [to] finaliz[e] our

proposal to target that budget neutrality adjustment on high wage hospitals." *See*

*id*.

Instead, the Secretary "finaliz[ed] a budget neutrality adjustment to the

national standardized amount for all hospitals so that the increase in the wage

index for low wage index hospitals . . . is implemented in a budget neutral

manner." *Id*. Thus, the Secretary finalized a 0.2016% hospital payment cut to

offset the additional payments that hospitals in the lowest wage index quartile

would receive as a result of the Low Wage Index Redistribution. 84 Fed. Reg. at

42,622, as corrected by 84 Fed. Reg. at 53,607.

This budget neutrality standardized rate reduction cut the Hospitals' FY

2020 inpatient payments by 0.2016%. The Secretary also stated his intent to

continue this policy and payment reduction for four years or more. 84 Fed. Reg. at

42,048 ("this policy will be effective for at least 4 years, beginning in FY 2020, in

order to allow employee compensation increases implemented by these hospitals

sufficient time to be reflected in the wage index calculation.").

*3.* The Secretary asserted in the FY 2020 Final Rule that he had the

authority to adopt the Low Wage Index Redistribution under the wage index

statute, 42 U.S.C. § 1395ww(d)(3)(E), which he described as "giv[ing] the

11

Secretary broad authority to adjust for area differences in hospital wage levels."

84 Fed. Reg. at 42,329.  Incredibly, the Secretary asserted that the Low Wage

Index Redistribution, which inflates one-in-four data-driven wage index values,

"will increase the accuracy of the wage index," and therefore stated his summary

disagreement with commenters' assertions that the policy (a) "disregards

accurately reported wage data," and (b) "is beyond the authority granted to the

agency under section [1395ww(d)(3)(E)]."  *Id.* at 42,331.[4]

    With respect to the associated budget neutrality payment reduction affecting

all hospitals, the Secretary asserted that the wage index statute, 42 U.S.C.

§ 1395ww(d)(3)(E), required that he implement the Payment Reduction and that "it

would be inappropriate to use the wage index to increase or decrease overall

---

    [4] The Secretary had previously hypothesized that he had authority to adopt
the Low Wage Index Redistribution and Payment Reduction under 42 U.S.C.
§ 1395ww(d)(5)(I):

> We believe we have authority to implement our lowest quartile wage
> index proposal . . . and our budget neutrality proposal . . . under [42
> U.S.C. § 1395ww(d)(3)(E)] (which gives the Secretary broad
> authority to adjust for area differences in hospital wage levels by a
> factor (established by the Secretary) reflecting the relative hospital
> wage level in the geographic area of the hospital compared to the
> national average hospital wage level, and requires those adjustments
> to be budget neutral), and under our exceptions and adjustments
> authority under [42 U.S.C. § 1395ww(d)(5)(I)].

84 Fed. Reg. at 19,396; *see also* 84 Fed. Reg. 42,329 (paraphrasing same).
Ultimately, however, the Secretary relied only on his wage index authority when
finalizing the inflation of wage index values.  *Id.* at 42,326-28.

[inpatient hospital] spending." 84 Fed. Reg. at 42,331. Therefore, the Secretary stated that, "if it is determined that section [1395ww(d)(3)(E)] does not require the wage index to be budget neutral, we invoke our authority at [42 U.S.C. § 1395ww(d)(5)(I)] in support of such a budget neutrality adjustment." *Id*.

The Secretary paraphrased comments questioning his authority to adopt the budget neutrality adjustment under subsection (d)(5)(I) as follows:

> (1) this "catchall" cannot be used in a manner that vitiates the language and purpose of the rest of the statute, including section [1395ww(d)(5)(A) through (H)], as there must be limits to the authority granted to [him] under this section; (2) [he] is not acting by regulation, and, therefore, is not following [subsection (d)(5)(I)]; and (3) if [he] does have the authority to make this change, this special authority is not required to be done in a budget neutral manner, as is clear from the statute where paragraph (d)(5)(I)(ii) references budget neutrality, but paragraph (d)(5)(I)(i) does not, and as is clear from relevant case law.

84 Fed. Reg. at 42,331. In response, the Secretary broadly expressed his belief that he "could use [his] broad authority under that provision to promulgate such an adjustment," *id.*, but did not offer any explanation or otherwise engage with these significant comments.

*4.* In an attempt to provide a policy rationale for the Low Wage Index Redistribution, the Secretary opined that it "would provide certain low wage index hospitals with an opportunity to increase employee compensation without the usual lag in those increases being reflected in the calculation of the wage index." 84 Fed. Reg. at 42,326; *see also* 84 Fed. Reg. at 42,327–28 (referring on numerous

13

occasions to providing "an opportunity for low wage index hospitals to increase" wages). However, the Secretary did not provide any data or studies supporting his speculation that hospitals with lower wages would increase employee compensation if not for the lag or that any hospital sets wages based on factors other than market forces. Nor did the Secretary contest the plain truth that hospitals with wage index values above the lowest quartile also experience this universal "lag in the process" alongside hospitals in the lowest quartile.

The Secretary further attempted to justify the Low Wage Index Redistribution by making the Orwellian (and obviously self-serving) assertion for the first time in the FY 2020 Final Rule that a counterfactual change to the wage index will *increase* its accuracy. 84 Fed. Reg. at 42,331 ("the intent of [the Low Wage Index Redistribution] is to increase the accuracy of the wage index as a technical adjustment . . . ."). The Secretary also contended he was not doing what he clearly was doing – rejiggering the wage index for his policy purposes. *Id*. ("The intent of [the Low Wage Index Redistribution] is . . . not to use the wage index as a policy tool to address non-wage issues related to rural hospitals, or the laudable goals of the overall financial health of hospitals in low wage areas or broader wage index reform.").

Remarkably, the Secretary stated that, under the Low Wage Index Redistribution, "the wage index for low wage index hospitals will appropriately

14

reflect the relative hospital wage level in those areas compared to the national average hospital wage level," and described his proposal as "based on the actual wages that we expect low wage hospitals to pay . . . ." 84 Fed. Reg. at 42,331 (emphasis added). The Secretary, however, imposed no such requirement as part of the Low Wage Index Redistribution or otherwise: Hospitals that receive increased payments due to the Secretary's counterfactual inflation of wage index values have no obligation to use those additional funds to increase hospital wages. Notably, low wage index hospitals informed the Secretary that they "reduce expenses in other areas to make up for" their growing labor expenditures, 84 Fed. Reg. at 19,394, suggesting that low wage index hospitals were already paying market wages and would use increased payments to improve their overall financial position.

In addition, the Secretary's reference to expected behavior facially contradicts the wage index statute, which requires the wage index to be based on actual survey data, rather than secretarial aspirations for the labor market. *See* 42 U.S.C. § 1395ww(d)(3)(E) (requiring that the wage index established by the Secretary "reflect[] the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level" and be "update[d] . . . on the basis of a survey . . . of the wages and wage-related costs" of hospitals); *see also* 42 C.F.R. § 412.64(h) ("[The Secretary] adjusts the proportion of the

15

Federal rate for inpatient operating costs that are attributable to wages and labor-related costs for area differences in hospital wage levels by a factor (established by [the Secretary] based on <u>survey data</u>) reflecting the relative level of hospital wages and wage-related costs in the geographic area . . . of the hospital compared to the national average level of hospital wages and wage-related costs.") (emphasis added).

## C.     <u>The Medicare Appeals Process and Judicial Review</u>

If a hospital is dissatisfied with a "final determination" as to the amount of its Medicare inpatient payments, the hospital may appeal to the Board if it meets the requirements set forth in 42 U.S.C. § 1395oo(a), including that the hospital files its appeal request with the Board within 180 days after notice of the Secretary's final determination.  A group of hospitals may bring such an appeal if the matter in controversy involves a common question of fact or interpretation of law or regulations and the amount in controversy is, in the aggregate, $50,000 or more.  42 U.S.C. § 1395oo(b).

The publication of inpatient hospital rates in the Federal Register constitutes a "final determination" that may be appealed to the Board.  42 U.S.C. § 1395oo(a).  The Board lacks the authority to adjudicate the validity of the Secretary's regulations and CMS Rulings.  42 C.F.R. § 405.1867.  If a hospital's jurisdictionally proper appeal involves a question of law that the Board is without

16

authority to decide, the Board may, through its own motion or upon the request of the hospital, grant expedited judicial review of the appeal in accordance with 42 U.S.C. § 1395oo(f)(1).  If expedited judicial review is granted, a hospital may seek judicial review of the final determination without a Board hearing.  *Id.*  Under 42 U.S.C. § 1395oo(f)(2), interest is to be awarded by the reviewing court in favor of a prevailing hospital.

## D.    <u>The Administrative Procedure Act</u>

Under 42 U.S.C. § 1395oo(f)(1), an action brought for judicial review "shall be tried pursuant to the applicable provisions under chapter 7 of title 5 . . ." of the U.S. Code, which contains the Administrative Procedure Act ("APA").  Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Furthermore, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

Additionally, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  The APA requires that the agency provide notice of proposed rulemaking, afford interested parties an

opportunity to comment on the proposed rulemaking, and consider the relevant matters presented.  5 U.S.C. § 553.

**E.    Statement of Facts and Prior Proceedings**

The Hospitals are Medicare-participating hospitals that were deprived of their statutorily required Medicare payments due to the Secretary's unlawful 0.2016% Payment Reduction finalized in the FY 2020 Final Rule, and are continuing to suffer financial harm under continued payment reductions through FY 2023.[5]  Furthermore, the Secretary recently proposed continuing the Low Wage Index Redistribution in FY 2024, extending it beyond the four years he envisioned in the FY 2020 rulemaking, and proposed his largest budget neutrality adjustment yet—a reduction of 0.2629%.[6]  88 Fed. Reg. 26,658, 27,216, 27,224 (May 1, 2023).

---

[5] *See* 85 Fed. Reg. 58,432, 59,034 (Sept. 18, 2020), as corrected by 85 Fed. Reg. 78,748, 78,754 (Dec. 7, 2020) (0.2030% payment reduction); 86 Fed. Reg. 44,774, 45,532 (Aug. 13, 2021), as corrected by 86 Fed. Reg. 58,019, 58,025 (Oct. 20, 2021) (0.1971% payment reduction); 87 Fed. Reg. 48,780, 49,418 (Aug. 10, 2022) (0.1854% payment reduction).

[6] In proposing the FY 2024 wage index, the Secretary used FY 2020 wage data, meaning that this is the first year where data could show the impact of the challenged Low Wage Index Redistribution.  Presumably, the higher budget neutrality adjustment proposed for FY 2024 suggests continuing the policy would be more costly than in prior years because differences in area hospital wages grew rather than contracted in FY 2020.

Following CMS's unlawful finalization of the Payment Reduction, the Hospitals timely filed Board appeals challenging their payments for FY 2020 on the grounds that the Secretary improperly reduced those payments by 0.2016%, and then sought expedited judicial review. The Board granted the Hospitals' requests, JA 33–42, and the Hospitals timely sought judicial review. *See* 42 U.S.C. § 1395oo(f)(1).

The Hospitals brought claims under the Medicare Act and the APA, asserting that the Low Wage Index Redistribution was in excess of the Secretary's statutory authority, arbitrary and capricious, and procedurally invalid. JA 25–29.[7] The Hospitals requested that the court vacate the FY 2020 Payment Reduction, require the Secretary to recalculate the Hospitals' FY 2020 payments after removing the effect of the 0.2016% payment reduction, and make the additional FY 2020 payments due to the Hospitals plus interest calculated under 42 U.S.C. § 1395oo(f)(2) and/or 42 U.S.C. § 1395g(d). JA 30.

Following cross-motions for summary judgment, the district court granted the Hospitals' motion in part and denied the Secretary's cross-motion, finding that the Secretary exceeded his statutory authority when he inflated the wage index values of one-quarter of Medicare-participating acute care hospitals, funded

---

[7] Hospitals have not pursued their claims under Count VI (Mandamus) and Count VII (All Writs Act).

through the 0.2016% payment reduction.  JA 79–80.  Having concluded that the

Secretary's policy exceeds his statutory authority, the court did not reach the

Hospitals' claim that the policy is arbitrary and capricious.

On July 27, 2022, the district court issued a "final appealable order"

remanding the case back to the Secretary "for further proceedings consistent with

this Order."  JA 88.  The district court declined to vacate the challenged payment

reduction and to award statutory interest under 42 U.S.C. § 1395oo(f)(2).  *Id.*  With

respect to the question of the interest award, the Secretary conceded in his

supplemental briefing to the district court that he "recognizes that plaintiffs are a

'prevailing party' for purposes of section 1395oo(f)(2), and as such 'the amount in

controversy shall be subject to annual interest.'"  Sec'y Br. Remedies at 13, 1:20-

CV-01574-CJN (D.D.C. May 9, 2022), ECF No. 32 (citing 42 U.S.C.

§ 1395oo(f)(2)).

The Secretary thereafter appealed the district court's "final, appealable order

of July 27, 2022, ECF No. 38."  JA 89.  Following the Secretary's appeal, the

Hospitals cross-appealed the same order, noting that they were appealing the final

Order "in this action on July 27, 2022, (1) remanding this action without vacatur

and (2) failing to award interest."  JA 90.

20

# VI. <u>SUMMARY OF THE ARGUMENT</u>

**A.**     The district court properly concluded that the Secretary exceeded his statutory authority in reducing Hospitals' Medicare payments to fund his unlawful inflation of one-in-four wage index values.  Because the agency action here vitiates the statutorily mandated wage index, it is not permissible under either the wage index statute or the Secretary's "exceptions and adjustments" authority.

*1.*     The plain language of the wage index statute mandates a single wage index established based on survey data and requires that the labor-related portion of hospital payments be adjusted for area differences in wages using this wage index.  42 U.S.C. § 1395ww(d)(3)(E).  After developing that single, uniform, data-driven wage index, the Secretary counterfactually distorted it by inflating the wage index values in the lowest quartile, thus impermissibly creating a wage index that misrepresents relative hospital wage levels.  Because the policy plainly made the wage index less accurate as a relative measure of wage differences, the challenged Low Wage Index Redistribution contravenes Congress's mandate, and the associated Payment Reduction is likewise unlawful.

*2.*     The Secretary's invocation of his authority to make "exceptions and adjustments" under 42 U.S.C. § 1395ww(d)(5)(I) likewise fails to save the Payment Reduction.  First, the Secretary only adopted the Payment Reduction at issue to fund his Low Wage Index Redistribution, so he has not and cannot argue

21

that the Payment Reduction could be lawful if the Low Wage Index Redistribution is unlawful.  Second, the Secretary could not have adopted the Low Wage Index Redistribution under subsection (d)(5)(I) because that general provision does not authorize him to subvert Congress's specific wage index requirements.  The Secretary also failed to comply with the statutory requirements under subsection (d)(5)(I): (1) he did not "deem[]" the Low Wage Index Redistribution "appropriate" under subsection (d)(5)(I), only adopting it for the asserted goal of increasing the accuracy of the wage index; and (2) he did not adopt any exception or adjustment "by regulation" as required under subsection (d)(5)(I).  Finally, the Payment Reduction exceeds the Secretary's authority because Congress only permits budget neutrality adjustments under subsection (d)(5)(I) in connection with adjustments for transfer cases under clause (ii).

**B.**     The Low Wage Index Redistribution and Payment Reduction are also arbitrary and capricious and must be set aside.

*1.*     The challenged policy is arbitrary and capricious because it is not rationally explained.  The Low Wage Index Redistribution indisputably makes the wage index less accurate through a forced counterfactual adjustment of one-in-four wage index values, and the Secretary's arguments to the contrary are illogical and unfounded.  The alteration of wage index values here is wholly unconnected with hospital wage levels, and the Orwellian assertion that counterfactually inflated

22

values for some hospitals improve the accuracy of the wage index for all hospitals is not only "internally inconsistent and inadequately explained," but belies common sense. *Banner Health*, 867 F.3d 1323, 1349 (D.C. Cir. 2017) (quoting *Dist. Hosp. Partners, L.P. v. Burwell*, 783 F.3d 46, 59 (2015)).

To the extent that the Secretary contends that the Secretary's policy is premised on his assumption that hospitals would increase their compensation as a result of the wage index inflation, this assumption is illogical (hospital wages reflect the labor market, not Medicare reimbursement rates), is not backed by studies, and is not supported by any policy mechanisms designed to ensure that benefitting hospitals actually increase wages.

The Secretary also defends the policy as addressing "data lag" issues, but he fails to explain why the inflation of one-in-four wage index values mitigates data lag issues. Again, the notion that low wage index hospitals would raise their wages as a result of overstated wage index values illogically assumes that hospital wages do not reflect market conditions and that a hospital would increase wages above market demands in response to the policy. More importantly, all hospitals are on an even playing field in terms of data lag—any hospital that operates in a market where wages are growing faster than the national average is harmed, and any hospital that operates in a market where wages are growing slower than the national average benefits from the data lag.

23

*2.*     Finally, the Secretary failed to consider and respond to significant comments as required under the APA.  Comments presented three specific reasons that the Secretary could not adopt the Payment Reduction under his subsection (d)(5)(I) authority, but the Secretary did not respond to these three concerns. Instead, he merely stated his belief that he could use his "broad authority under that provision to promulgate such an adjustment."  84 Fed. Reg. at 42,331.

**C.**     The district court erred in failing to vacate the Secretary's unlawful payment policy and failing to award Hospitals statutory interest as the prevailing party under 42 U.S.C. § 1395oo(f)(2).  This Court has jurisdiction to consider the Hospitals' cross-appeal of these issues because the Secretary's own appeal places the order of July 27, 2022, properly before this Court.  "[W]hat matters for the purposes of . . . appellate jurisdiction is whether the district court's decision—and not any particular party challenging it—is properly before [this Court] . . . ." *NAACP v. U.S. Sugar Corp.*, 84 F.3d 1432, 1436 (D.C. Cir. 1996).  Vacatur is the normal remedy under 5 U.S.C. § 706(2), and departing from that normal remedy is particularly inappropriate where the challenged secretarial action exceeds statutory authority because the Secretary cannot rehabilitate his rule with further explanation or other agency action on remand.  Finally, because the Hospitals are the prevailing parties in this dispute, the district court erred in failing to award the interest required under 42 U.S.C. § 1395oo(f)(2).

24

# VII. <u>STANDARD OF REVIEW</u>

This Court exercises *de novo* review of the legal issues in this appeal, including the district court's grant of summary judgment, *Pub. Citizen, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 332 F.3d 654, 658 (D.C. Cir. 2003), and may affirm on a different theory than that relied on by the district court, *Bennett v. Spear*, 520 U.S. 154, 166–67 (1997).  Jurisdiction over this action arises under 42 U.S.C. § 1395oo(f), which provides that it "shall be tried pursuant to the applicable provisions under" the APA.  Accordingly, this Court's review of the Secretary's actions is governed by 5 U.S.C. § 706(2)(A), which requires the Court to determine whether his actions are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414–17 (1971).  If so, the Court must set them aside.

# VIII. <u>ARGUMENT</u>

## A.    <u>The Secretary's Payment Reduction Exceeds His Medicare Act Authority.</u>

The Payment Reduction unlawfully cut the Hospitals' Medicare payments to subsidize the Secretary's counterfactual and selective inflation of wage index values for one-in-four Medicare hospitals.  Far from being authorized by the wage index statute, 42 U.S.C. § 1395ww(d)(3)(E), the Low Wage Index Redistribution directly contravenes Congress's explicit statutory mandate to apply a single, rational wage index that reflects relative wage levels.  As such, the district court

here, like the *Kaweah Delta* Court,[8] properly concluded that the Low Wage Index

Redistribution—and, in particular, the challenged Payment Reduction—is not

permitted under subsection (d)(3)(E) or (d)(5)(I).  The Payment Reduction should

therefore be set aside, and this Court should award statutory interest to the

Hospitals as prevailing parties under 42 U.S.C. § 1395oo(f)(2).

      1.    <u>The Low Wage Index Redistribution and the Payment Reduction Violate the Wage Index Statute.</u>

          *a.     The Policies Violate the Plain Terms of § 1395ww(d)(3)(E).*

Under the wage index statute, the Secretary "shall" adjust the labor-related

portion of inpatient payments "for area differences in hospital wage levels."  42

U.S.C. § 1395ww(d)(3)(E)(i).  To do so, the Secretary must compute "a factor"

that "reflect[s] *the* relative hospital wage level in the geographic area of the

hospital compared to *the* national average hospital wage level."  *Id.* (emphasis

added).  The Secretary "shall update" the wage index annually "on the basis of a

survey conducted by the Secretary (and updated as appropriate) of the wages and

wage-related costs" of hospitals.  *Id.*  The congressional "purpose of this section is

to ensure that the reimbursement rate is adjusted to reflect geographical variations

in labor costs."  *Atrium Med. Ctr. v. Sebelius*, 917 F. Supp. 2d 688, 695 (S.D. Ohio

---

[8] The only decisions evaluating the Secretary's challenged policy are the district court decision in the case at bar and *Kaweah Delta Health Care District v. Becerra*, No. CV 20-6564-CBM-SP(X), 2022 WL 18278175 (C.D. Cal. Dec. 22, 2022)*, appealed* Nos. 23-55157, 23-55209 (9th Cir.).

2013) (citing *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994)), *aff'd sub nom. Atrium Med. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 766 F.3d 560 (6th Cir. 2014).

As the district court properly concluded, Congress's use of (1) "the definite article 'the' in the phrase 'the national average hospital wage level,'" (2) use of the "singular—'the proportion' and 'a factor,'" and (3) use of "'the' in the phrase '*the* relative hospital wage level'" all require a single, uniform wage index.  JA 72–73 (quoting 42 U.S.C. § 1395ww(d)(3)(E)(i); *Atrium*, 766 F.3d at 569); *Centra Health, Inc. v. Shalala*, 102 F. Supp. 2d 654, 660 (W.D. Va. 2000) ("[T]he Act requires the Secretary to create an index that accurately represents the relative wage levels of hospitals in a given [wage area]").  Moreover, "the requirement that the agency rely on survey data implies (at the least) that the agency's wage index 'must in fact encompass only "wages and wage-related costs" and must reasonably "reflect the relative hospital wage level" in a given area.'"  JA 72–73 (citing *Atrium*, 766 F.3d at 569); *see also* 42 C.F.R. § 412.64(h) (noting that the wage index is "established by CMS based on survey data").  The Secretary has himself acknowledged these requirements, describing the wage index as "a technical adjustment designed to be a relative measure of the wages and wage-related costs of subsection (d) hospitals in the United States" and "not a policy tool."  84 Fed.

27

Reg. at 42,331; *see also id.* at 42,328 ("The wage index is a technical payment adjustment.").

Congress thus straightforwardly and rationally designed the wage index as a mechanism to account for actual, regional variations in labor costs determined in light of historical survey data. As this Court has noted, "at any given time the wage index must reflect the Secretary's best approximation of relative regional wage variations." *Methodist*, 38 F.3d at 1230. These relative wage differences go beyond the rank order of wage levels and encompass the proportionality of those wage differences. The Secretary must collect data and calculate the wage index "[u]niformly and nationwide," applying rules "consistently and evenhandedly for all hospitals." *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1172 (D.C. Cir. 2015). To do otherwise defeats the commands and purpose of § 1395ww(d)(3)(E).

The Low Wage Index Redistribution contradicts this express congressional mandate. To implement the Low Wage Index Redistribution the Secretary began with the single, uniform wage index determined using his usual data-based process and then inflated one-quarter of the wage index values based solely on the difference between the uniformly determined wage index value and the 25th percentile wage index value. In so doing, the Secretary distorted the wage index and relative hospital wage levels: For example, if a hospital's data-driven wage index value was 0.6629 (reflecting a hospital labor market with a wage level of

28

66% of the national average), the Secretary's policy inflated the hospital's wage index value to 0.7543, improperly treating that hospital as if it were operating in a hospital labor market with a wage level of 75% of the national average, which it was not. Because the inflation of wage index values distorts the proportionality of relative differences in wage levels, the Secretary's stated preservation of the "rank order" of wage index values (Sec'y Br. at 33) does not satisfy the requirements under subsection (d)(3)(E). *Kaweah Delta,* 2022 WL 18278175, at *5-6 and n.7.

The Secretary then cut inpatient Medicare payments to all hospitals to offset the expected increase in payments resulting from his policy, thereby redistributing Medicare hospital payments from hospitals operating in mid- and high-cost labor markets to those with lower wage levels. In sum, the Secretary deviated from the single, uniform, relative wage index required by Congress to inflate one-in-four wage index values and redistribute payments.

> b.  *The Secretary Placed His Thumb on the Factually Based Wage Index Scale, Diminishing its Accuracy.*

The Secretary attempts to fit his policy within his technical wage index authority by describing his inflation of one-in-four wage index values as correcting for "artificially deflated wage index values for low wage index hospitals" (at 32), expressing his "predictive judgments" (at 34), and constituting "reasonable approximations based on the most reliable data available" (at 35, quoting *Anna Jacques*, 797 F.3d at 1165 (internal quotation marks omitted)). This effort to dress

29

up the policy as a sophisticated projection of wage index values fails—instead, it remains a blunt, counterfactual inflation not based in any judgment regarding actual wage conditions or trends and not based in additional data on wages and wage-related costs.  Simply put, actual data is *ipso facto* not "artificial" – the artifice here is the Secretary's inflationary manipulation.

By way of contrast, in *Anna Jaques Hospital v. Sebelius*, this Court recognized that the Secretary could properly "scrub[] from the survey data she determined would not reasonably help create a meaningful wage index" because they were "incomplete[,] inaccurate . . . , or otherwise aberrant."  583 F.3d 1, 5 (D.C. Cir. 2009); *see also Sierra Club v. EPA*, 356 F.3d 296, 306 (D.C. Cir. 2004) (permitting adjustments based on a supplementary analysis "employed to ensure that the model achieved its statutory purpose" by "correct[ing] for the model's over-prediction of ozone levels as compared to actual observations, and for its reliance on a base day that appears to be a statistical outlier").  Here, the Secretary had already done this data scrubbing, "apply[ing] proxy data" for aberrant data.  84 Fed. Reg. at 42,309.  Hospitals do not challenge this routine process—the issue here is his <u>subsequent inflation</u> of one-fourth of the wage index values without regard for actual wage conditions or trends.

Likewise, the policy is not defensible as a "'reasonable approximations' based on the 'most reliable data available.'"  Sec'y Br. at 35 (quoting *Anna Jacques*, 797

30

F.3d at 1165).  Here, the most reliable data available was used to establish the pre-inflation wage index, and the Low Wage Index Redistribution counterfactually distorted it by inflating one-in-four wage index values.

In defending his policy, the Secretary (at 32) also expresses concern that "relying on historical data to calculate wage index values 'creates barriers to hospitals with low wage index values from being able to increase employee compensation'" and (at 32–33) describes his policy as capturing what he would expect "the wage levels of [low wage index] hospitals to be but for the systematic challenges posed by the need to rely on historical data."  Accepting for purposes of argument that the Secretary's assertions are rational (they are not), they remain unavailing because (1) Congress mandated the use of historical data ("survey" data) and (2) the natural consequence of the congressionally mandated wage index is that hospitals in lower cost labor markets receive lower payments.  The Secretary cannot gin-up criticisms of statutory requirements to create a statutory ambiguity for the Secretary to supposedly resolve.  *See SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1358–59 (2018) ("The Director may (today) think his approach makes for better policy, but policy considerations cannot create an ambiguity when the words on the page are clear.  Neither may we defer to an agency official's preferences because we imagine some 'hypothetical reasonable legislator' would have favored that approach.") (citation omitted).

31

Moreover, the argument that the counterfactually distorted wage index is somehow more accurate than the data-driven wage index because of data lag is obviously a non-starter. All hospitals stand on an even playing field in terms of data lag. Any hospital operating in a market where wages are increasing faster than the national average is harmed by the time it takes the Secretary's wage index to reflect those market changes, regardless of the hospital's wage index level. And, in fact, a hospital in a stagnating labor market actually *benefits* from data lag because its wage index value is based on historic data. In short, because data lag impacts all hospitals (and benefits low wage index hospitals in slowing labor markets), it is irrational to conclude that inflating low wage index hospitals' wage index values will somehow correct for the impact of data lag on the wage index.

The Secretary's policy thus fails to "give effect to [Congress's] unambiguously expressed intent" based on the "text, structure, purpose, and legislative history" of subsection (d)(3)(E). *See U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 605 (D.C. Cir. 2016). Far from reasonable, the Secretary's expansive interpretation of his authority under the wage index statute would permit the Secretary to manipulate data-driven wage index values to selectively diminish the extent to which they reflect relative area differences in hospital wage levels.

          c.     *The Low Wage Index Redistribution Uses an Unlawful, Non-Uniform Inflation of Wage Index Values.*

Finally, the Secretary (at 37–38) quarrels with the district court's conclusion that the Secretary's Low Wage Index Redistribution "is not 'uniformly determined and applied.'" JA 73 (quoting *Atrium*, 766 F.3d at 569). Under the Secretary's recounting (at 37), he "established a multi-step methodology for calculating the wage index that applied to all hospitals" and "one aspect of the methodology revised the calculation for certain low wage hospitals." The Secretary (*id.*) readily admits he employed this additional methodological step *only* when calculating the wage index values for hospitals in the lowest quartile. Instead of utilizing a wage index methodological step "consistently and evenhandedly for all hospitals," *Anna Jacques*, 797 F.3d at 1172, the Secretary unevenly and artificially inflated the wage index values of one-in-four hospitals when applying his Low Wage Index Redistribution. Thus, the district court properly concluded that the Secretary unlawfully determined and applied a non-uniform wage index. JA 73; *see also Kaweah Delta,* 2022 WL 18278175, at *5 (same); *Sarasota Mem'l Hosp. v. Shalala*, 60 F.3d 1507, 1512–13 (11th Cir. 1995) (noting that subsection (d)(3)(E) requires both a "uniform picture" of wage levels and "a uniform index").

2.    The District Court Properly Ruled That the Secretary Could Not Impose the Payment Reduction under § 1395ww(d)(5)(I)(i).

The Secretary's Low Wage Index Redistribution, including the challenged Payment Reduction, cannot be saved by invoking his subsection (d)(5)(I)(i) "exceptions and adjustment" authority.  Critically, it is neither an exception nor an adjustment to gut the specific solution Congress has adopted to address area differences in wage levels by inflating one-in-four wage index values.  Whatever authority the Secretary has to adopt appropriate exceptions and adjustments, this authority is not a "*carte blanche* to override the rest of the [Medicare] Act." *Shands Jacksonville*, 139 F. Supp. 3d at 260.  Neither this Court's decision in *Adirondack Medical Center v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014), nor accepted principles of statutory construction, bring the Secretary's challenged actions here within the bounds of his Medicare Act authority.

a.    *The Secretary Cannot Defend the Payment Reduction as a Freestanding Adjustment.*

Nowhere does the Secretary argue that the Payment Reduction could be lawful if the Low Wage Index Redistribution is unlawful.  Rightly so.  Subsection (d)(5)(I) permits the Secretary to provide "other exceptions and adjustments" to inpatient payment amounts "as the Secretary deems appropriate."  42 U.S.C. § 1395ww(d)(5)(I)(i).  In the FY 2020 Final Rule, the Secretary stated that, if budget neutrality is not required under subsection (d)(3)(E), he "invoke[s his]

authority at [subsection (d)(5)(I)] in support of [the] budget neutrality adjustment."

84 Fed. Reg. at 42,331.  In the words of subsection (d)(5)(I)(i), then, the Secretary

only "deem[ed] appropriate" budget neutral implementation of the Low Wage

Index Redistribution policy and did not deem a freestanding 0.2016% payment

reduction appropriate.  Having expressly tethered the appropriateness of the

Payment Reduction to the Low Wage Index Redistribution policy, the

unlawfulness of the Low Wage Index Redistribution renders the Payment

Reduction unlawful, and the Secretary presents no argument to the contrary.

> b.    *The Secretary's Policy Conflicts with Subsection (d)(3)(E) and Could Not Be Adopted Under His Subsection (d)(5)(I) Authority.*

The Secretary cannot rely on subsection (d)(5)(I)(i) to subvert the wage

index or violate the wage index statute.  Section 1395ww(d)(3)(E) specifically

instructs the Secretary to adjust a defined portion of Medicare payments using a

wage index calculated from actual wage data and reflecting geographic differences

in relative wage levels, and this express congressional command carries with it the

natural consequence that hospitals in low wage markets will be paid less than

hospitals in high wage markets.  Notwithstanding the general grant of authority

under subsection (d)(5)(I)(i), the specific and explicit congressional instructions

regarding the wage index strip the Secretary of discretion to develop an alternative

approach to area wage differences or temper the consequences of the statutory

wage index by counterfactually inflating one-in-four wage index values. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (noting that the "general/specific canon" has particular force where Congress "has deliberately targeted specific problems with specific solutions") (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)); JA 78 (concluding that subsection (d)(5)(I)(i) does not authorize the Secretary to "gut the specific statutory provision in place to calculate the wage index" or "render meaningless [this] statutory framework" by inflating one-in-four wage index values); *Kaweah Delta*, 2022 WL 18278175, at *7 (holding that the Secretary lacks the authority to "inflate the wage index value" under subsection (d)(5)(I)(i)).

Despite the Secretary's protestations (at 40–45), this Court's precedent in *Adirondack* and otherwise does not permit the Secretary to vitiate the statutory wage index system with limitless subsection (d)(5)(I)(i) authority. Briefly, the *Adirondack* Court held that "the statutory scheme was ambiguous and unclear," and the Secretary could therefore reasonably apply an adjustment to the hospital-specific rate under subsection (d)(5)(I) that mirrored an adjustment to the standardized amount explicitly authorized by other statutory provisions that were silent regarding the hospital-specific rate.[9]  740 F.3d at 701.  In relevant part, the

---

[9] Those provisions are 42 U.S.C. § 1395ww(d)(3)(A)(vi) (permitting the Secretary to "adjust the average standardized amounts . . . so as to eliminate the
(footnote continued)

hospital-specific rate starts with the "historic operating costs at an individual" sole community hospital or Medicare dependent hospital. *Id.* at 695. Other hospitals are paid under the "federal rate," which starts with the standardized amount. *Id.* at 694. Whether a hospital is paid the "federal rate" or the "hospital-specific rate," the payment amount is adjusted based on the relative weight assigned to the applicable diagnosis-related group. *Id.* at 694–95. After the Secretary revamped the coding and classification of diagnosis-related groups, he determined that aggregate hospital payments increased based on those changes rather than real changes in case mix. *Id.* at 695–96. He then adjusted the standardized amount pursuant to express authority under 42 U.S.C. § 1395ww(d)(3)(A)(vi) and section 7(b) of the TMA, and he adopted a corresponding adjustment to the hospital-specific rate using his exceptions and adjustments authority under 42 U.S.C. § 1395ww(d)(5)(I). *Id.* at 696. The *Adirondack* hospitals challenged the latter adjustment. *Id.*

　　In concluding that the statutory scheme at issue was ambiguous and that the Secretary reasonably relied on subsection (d)(5)(I) to support his adjustment to the hospital-specific rate, *id.* at 698–701, the *Adirondack* Court emphasized that the

---

effect of [certain] coding and classification changes") and section 7(b) of the Transitional Medical Assistance, Abstinence Education and QI Programs Extension Act of 2007, Pub. L. No. 110–90, 121 Stat. 984, 986 (2007) ("TMA") (requiring adjustments to the standardized amounts to address certain changes in coding and classification in specified years).

specific grants of authority under subsection (d)(3)(A)(vi) and section 7(b) of the

TMA are consistent with making "assurance double sure" and do not demonstrate

"unambiguous congressional intent" to narrow the Secretary's subsection (d)(5)(I)

authority to adjust the hospital-specific rate. *Id.* at 698 (quoting *Shook v. D.C. Fin.*

*Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998)).

The *Adirondack* Court also went on to note that the relevant statutory provisions

could be "harmonize[d]" by concluding that subsection (d)(5)(I) "operates to the

extent that § 1395ww(d)(3)(A)(vi) and section 7(b)(1) of the TMA are silent." *Id.*

at 698–99.

   In contrast, the Secretary's counterfactual inflation of wage index values to

artificially narrow the differences in wage index values directly conflicts with the

*express* mandate of subsection (d)(3)(E) and undermines congressional intent with

respect to the wage index system. *See Kaweah Delta,* 2022 WL 18278175, at *8

("[A]dopting the Secretary's interpretation of the Exceptions and Adjustments

clause as granting him authority to inflate the wage index values of the lowest

quartile of hospitals would present a fundamental conflict with the specific

provisions in the statute prescribing the manner in which the Secretary may"

calculate and adjust wage index values). As the district court here explained,

"Congress has enacted a complex scheme and has targeted specific problems with

38

specific solutions" with the wage index, and the Secretary cannot use subsection (d)(5)(I) to undermine that statutory scheme.  JA 78.

Unlike § 1395ww(d)(3)(A)(vi) and TMA section 7(b)—two provisions that were undeniably silent with respect to the adjustments to the hospital-specific rate challenged in *Adirondack*, § 1395ww(d)(3)(E) clearly instructs the Secretary how to calculate the wage index and requires him to use the resulting, uniform wage index to adjust the labor-related portion of hospital Medicare payments.  *See supra*, pp. 5–7, 26–33.  The Secretary's exercise of his exceptions and adjustments authority under subsection (d)(5)(I) facially undermines the wage index framework mandated by Congress under section 1395ww(d)(3)(E).

Far from serving as "controlling precedent" that the district court allegedly "failed to grapple with" (Sec'y Br. at 44), *Adirondack* does not support the Secretary's use of subsection (d)(5)(I) to subvert a congressional mandate.  In *Adirondack,* the Secretary relied on § 1395ww(d)(5)(I)(i) to *extend* congressionally mandated standardized amount adjustments to hospital-specific rates.  But here, the Secretary seeks to use his exceptions and adjustments authority to *undo* what Congress directed under § 1395ww(d)(3)(E).  *See* 740 F.3d at 699.  As the *Kaweah Delta* Court concluded, the Secretary's interpretation of subsection (d)(5)(I)(i) as authorizing the Low Wage Index Redistribution would "present a fundamental conflict" with the wage index statute.  2022 WL 18278175, at *8.  The Secretary

39

cannot "get around clear statutory directives by invoking the exceptions and adjustments provision as a basis of unbounded authority."  JA 78.

The Secretary endeavors (at 44) to bring this case within the purview of *Adirondack* by contending that "[s]ection 1395ww(d)(3)(E)(i) does not expressly address adjusting wage index values for disparities between low and high wage hospitals."  This of course is not true—the wage index statute expressly commands the Secretary to adjust the labor-related portion of hospital payments "for area differences in hospital wage levels," necessarily requiring the Secretary to create disparities between low and high wage hospitals based on statutorily defined factors.  42 U.S.C. § 1395ww(d)(3)(E)(i).

Congress has also modified the wage index statute to enact specific solutions to specific wage index problems, *e.g.*, capping the portion of hospital payments that are subject to wage index adjustments at 62% for hospitals with wage index values less than 1.00.  *See id.* at § 1395ww(d)(3)(E)(ii)–(iv).  Thus, contrary to the Secretary's assertion, Congress has expressly addressed disparities between low and high wage hospitals, spelling out where and how the wage index operates to create statutorily mandated payment disparities.  In short, "Congress has enacted a complex scheme and has targeted specific problems with specific solutions."  JA 78 (citing *HCSC–Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam)).

40

The Secretary (at 7, 39, 40) briefly notes his invocation of his subsection (d)(5)(I)(i) authority with respect to wage index policies adopted in his FY 2005 and FY 2023 rulemakings.  69 Fed. Reg. 48,916, 49,106–08 (Aug. 11, 2004); 87 Fed. Reg. 48,780, 49,018 (Aug. 10, 2022).  Although neither policy is before this Court, it is worth emphasizing that the Secretary did not, through these policies, "gut the specific statutory provision in place to calculate the wage index" or "render meaningless [this] statutory framework" (JA 78).  Rather, his policies complemented statutory requirements in a manner consistent with congressional aims.  *See* 69 Fed. Reg. at 49,107 (permitting a few sole community hospitals in low-population density states to obtain temporary reassignment to another in-state geographic area when the Secretary's criteria under section 508 of Public Law 108-173, 69 Fed. Reg. 661 (Jan. 6, 2004) excluded some sole community hospitals but not others from using that one-time, temporary reclassification process, and noting that an exception is appropriate because "employees are likely to commute greater distances to work" such that "[m]ore distant areas . . . compete for labor than is the case in more densely populated States"); 87 Fed. Reg. at 49,018–20 (using his (d)(5)(I) authority to phase in significant decreases in wage index values that would generally result from "specific policy changes" and other "external factors beyond a hospital's control" to promote "predictability," "mitigate

instability," and enable hospitals to "explore potential reclassification options" or "more effectively budget and plan their operations").[10]

This Court should therefore affirm the district court's holding that the Secretary cannot rely on his "exceptions and adjustments" authority here, as to do so "would gut the specific statutory provisions in place to calculate the wage index."  JA 78.

> c.    *The Secretary Failed to Comply with the Express Requirements of Subsection (d)(5)(I).*

Even if the Low Wage Index Redistribution and associated Payment Reduction could have been lawfully adopted as exceptions or adjustments under subsection (d)(5)(I) (they could not), the Secretary did not properly invoke subsection (d)(5)(I) to adopt the Low Wage Index Redistribution and failed to adopt either the Low Wage Index Redistribution or Payment Reduction *by regulation* (*i.e.*, a regulation published in the Code of Federal Regulations) as required under subsection (d)(5)(I).

---

[10] Notably, the promotion of predictability is wholly consistent with the language and purpose of prospective payment system statute and is unlike the inflation of the lowest quartile of wage index values to diminish the impact of relative differences in wage levels on payments.  *See Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1019 (D.C. Cir. 1999) (noting that the inpatient prospective payment system statute reflects Congress's concern with the "predictability of payment") (citing H.R. Rep. No. 98-25, 132, 1983 U.S.C.C.A.N. 219, 351).

*1.*    As a preliminary matter, although the Secretary "invoke[d his] authority" under subsection (d)(5)(I) "in support of . . . a budget neutrality adjustment" (*i.e.*, the Payment Reduction), 84 Fed. Reg. at 42,331, he did not similarly invoke such authority with respect to his inflation of wage index values. Instead, the Final Rule focuses on the Secretary's (erroneous) contention that he can adopt the Low Wage Index Redistribution under subsection (d)(3)(E) because it "increases the accuracy of the wage index as a relative measure." *Id.* at 42,327; *see generally id.* at 42,326–28 (adopting the Low Wage Index Redistribution as a wage index measure without reference to the Secretary's subsection (d)(5)(I) authority). At no point in rulemaking did the Secretary suggest that the Low Wage Index Redistribution would still be appropriate if it exceeds his wage index authority, and the Secretary cannot now save the policy with his *post-hoc* insistence that his inflation of wage index values was an exception or adjustment under subsection (d)(5)(I). *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (internal citations omitted) ("Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.").

The Secretary's attempts to find an invocation of section 1395ww(d)(5)(I)(i) in fleeting statements made in the FY 2020 Proposed Rule and Final Rule are unavailing. The Secretary (at 45–46) relies on 5 U.S.C. § 553(b) and (c) to argue

43

all the Secretary needs is a "reference to the legal authority under which the rule is proposed" and a "concise general statement of [its] basis." But APA standards do not eliminate the express requirement under subsection (d)(5)(I) that he "deem[]" an exception or adjustment "appropriate." 42 U.S.C. § 1395ww(d)(5)(I)(i). The Secretary here failed to meet that standard with respect to his Low Wage Index Redistribution. At most, he hypothesized in the FY 2020 Proposed Rule that he could invoke his subsection (d)(5)(I) authority in support of the Low Wage Index Redistribution and Payment Reduction. 84 Fed. Reg. at 19,396 ("We believe we have authority to implement our lowest quartile wage index proposal . . and our budget neutrality proposal . . . under [subsection (d)(3)(E)] . . . , and under our exceptions and adjustments authority under [subsection (d)(5)(I)]."). In the Final Rule, the Secretary made no mention of his exceptions and adjustments authority in finalizing the Low Wage Index Redistribution, instead focusing on his technical authority and accuracy issues. 84 Fed. Reg. at 42,326–28. In the subsequent section entitled "Budget Neutrality for Providing an Opportunity for Low Wage Index Hospitals to Increase Employee Compensation," *id.* at 42,328, he made a "fleeting" reference "to what was discussed in the proposed rule." JA 77, n.9; *see* 84 Fed. Reg. at 42,329 ("We stated in the proposed rule that we believe we have authority to implement our lowest quartile wage index proposal . . . and our budget neutrality proposal" under subsection (d)(3)(E) and subsection (d)(5)(I)).

44

In contrast, when finalizing the Payment Reduction, the Secretary stated that "even if the wage index were not required to be budget neutral under [subsection (d)(3)(E)], [he] would consider it inappropriate to use the wage index to increase or decrease" overall inpatient spending. *Id.* at 42,331. Thereafter, he expressly "invoke[d his] authority" under subsection (d)(5)(I), but only in support of the "budget neutrality adjustment." *Id.* The Final Rule contains no corresponding statement suggesting that the Secretary deemed the Low Wage Index Redistribution appropriate as anything other than a so-called technical adjustment under subsection (d)(3)(E).

Against this backdrop, the district court properly observed that the "fleeting statements in the Final Rule . . . most likely cannot be read as [the Secretary] basing [his] authority to promulgate the low wage index hospital policy on the exceptions and adjustments provision." JA 77, n.9. Having failed to deem the Low Wage Index Redistribution appropriate as an exception or adjustment under subsection (d)(5)(I) in rulemaking, the Secretary cannot now, in litigation, defend it under subsection (d)(5)(I).

*2.*    The Secretary also failed to "provide by regulation" for the Low Wage Index Redistribution or Payment Reduction as is expressly required under subsection (d)(5)(I). Rather, he merely finalized both in the preamble to the FY 2020 Final Rule without amending the relevant payment system regulation at 42

45

C.F.R. § 412.64.  *Cf.* 87 Fed. Reg. at 49,403 (codified at 42 C.F.R. § 412.64(h)(7))

(adopting the 5% cap on decreases in wage index values by amending his wage

index regulation).

A "regulation" is expressly required under subsection (d)(5)(I), and this

requirement must be given effect.  *See Duncan v. Walker*, 533 U.S. 167, 174

(2001) ("It is [the Court's] duty 'to give effect, if possible, to every clause and

word of a statute.'") (quoting *United States v. Menasche*, 348 U.S. 528, 538–39

(1955)).  Here, the Secretary only adopted the Low Wage Index Redistribution and

Payment Reduction in the preamble to the FY 2020 Final Rule, but preambles to

regulations are not themselves regulations.  *See Nat'l Wildlife Fed'n v. EPA*, 286

F.3d 554, 569 (D.C. Cir. 2002) ("The preamble to a rule is not more binding than a

preamble to a statute. 'A preamble . . . is not an operative part of the statute and it

does not enlarge or confer powers on administrative agencies or officers.'")

(quoting *Ass'n of Am. R.Rs. v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977)).

Instead, publication in the Code of Federal Regulations is required for a regulation.

*See Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538–39 (D.C. Cir.

1986) ("The real dividing point between regulations and general statements of

policy is publication in the Code of Federal Regulations"), *quoted in AT&T Corp.*

*v. Fed. Commc'ns Comm'n*, 970 F.3d 344, 350 (D.C. Cir. 2020); *see also* Dep't

Health & Human Servs., Off. Gen. Couns., Advisory Op. 20-05 on Implementing

*Allina* (Dec. 3, 2020), https://www.hhs.gov/sites/default/files/allina-ao.pdf (quoting

*AT&T Corp.* with approval and only acknowledging rulemaking through

preambles in "rare" instances when the agency "make[s] clear its intent" to do so).

In a meticulous analysis of the "by regulation" requirement, the *Kaweah*

*Delta* Court reviewed this Court's precedents (including *AT&T Corp.*) and others,

as well as Advisory Opinion 20-05 from the Secretary's Office of the General

Counsel, and concluded that the Secretary failed to implement the challenged

policy "by regulation" when he failed to publish it in the Code of Federal

Regulations and had "not identified anything in the record demonstrating the

Secretary made it clear that he intended to engage in rulemaking through the

preamble to the final rule."  2022 WL 18278175, at *12.

> d.    *The Payment Reduction is Not a Permissible Budget Neutrality Adjustment Under Subsection (d)(5)(I)(ii).*

The Payment Reduction is also not a lawful exercise of the Secretary's

exceptions and adjustments authority because budget neutrality adjustments are

permitted <u>only</u> for adjustments involving transfer cases.  Subsection (d)(5)(I)

consists of two clauses, with the first conferring general authority to make "other

exceptions and adjustments," 42 U.S.C. § 1395ww(d)(5)(I)(i), and the second

permitting the Secretary to "make adjustments . . . to assure that the aggregate

payments" do not increase due to adjustments "for transfer cases."  *Id.* at

§ 1395ww(d)(5)(I)(ii).  As a preliminary matter, this latter clause cannot be read as

47

a legal nullity by interpreting the first clause as broadly permitting budget

neutrality adjustments. *See In re Surface Mining Regul. Litig.*, 627 F.2d 1346,

1362 (D.C. Cir. 1980) ("It is . . . a fundamental principal of statutory construction

that effect must be given, if possible, to every word, clause and sentence of a

statute . . . so that no part will be inoperative or superfluous, void or

insignificant.") (internal quotations omitted).

      The relevant regulatory and legislative history supports the view that budget

neutrality adjustments are not authorized under clause (i).  In its March 1, 1993

report, which was transmitted to Congress, the Prospective Payment Assessment

Commission ("ProPAC") recommended as follows: "The Congress should provide

authority to the Secretary to implement, in a budget neutral manner, necessary

changes for a graduated per diem payment for transfer cases. Current law allows

budget neutral changes to outlier policy but not to transfer policy."  58 Fed. Reg.

30,222, 30,624 (May 26, 1993) (proposed rule) (emphasis added).  Later that year,

the Secretary noted "ProPAC recommends that Congress provide authority to the

Secretary to implement future changes in a budget neutral manner, and we intend

to seek that authority."  58 Fed. Reg. 46,270, 46,308 (Sept. 1, 1993).  After

receiving the ProPAC report, the Senate introduced the Social Security Act

Amendments of 1993 (S. 1668) with a summary noting that the proposed

amendment to subsection (d)(5)(I) would "authorize[ the Secretary] to make future

revisions to transfer payment policy in a budget neutral manner." 103 Cong. Rec.

S15935 (daily ed. Nov. 17, 1993).

After the 1993 Senate Bill failed to progress, the Secretary declined to

change the transfer payment methodology for FY 1995 because he did not believe

he had authority to do so in a budget neutral fashion:

> [W]e do not feel it would be appropriate to change the transfer
> payment methodology absent an offsetting savings provision. We
> note that, in its March 1, 1993 report to Congress, ProPAC
> recommended that Congress provide authority to [the Secretary] to
> implement a graduated payment methodology in a budget neutral
> manner; as yet, no such legislative change has been enacted.

59 Fed. Reg. 45,330, 45,366 (Sept. 1, 1994). The following month, Congress

enacted the Social Security Act Amendments of 1994, Pub. L. 103-432, § 109, 108

Stat. 4398, 4408 (1994), which contained the identical amendment to (d)(5)(I) first

included in the 1993 Senate Bill. The Secretary thereafter proposed and finalized a

budget neutral transfer policy, explaining:

> Section 109 of the Social Security Act Amendments of 1994 . . .
> authorized the Secretary to make adjustments to . . . standardized
> amounts so that adjustments to the payment policy for transfer cases
> do not affect aggregate payments. In light of this authority, we
> believe the benefits of the graduated per diem methodology [for
> transfer cases] now outweigh the concerns that we expressed in the
> September 1, 1994 final rule.

60 Fed. Reg. 29,202, 29,221 (June 2, 1995) (proposed rule); *see also* 60 Fed. Reg.

at 29,259, 29,263, 29,266, 29,360 (discussing statutory authority under section

49

109); 60 Fed. Reg. 45,778, 45,805, 45,854, 45,859, 45,862, 45,930 (Sept. 1, 1995) (same).

The impact of the transfers clause on the scope of the Secretary's adjustment authority in non-transfer cases is an issue of first impression for this Court. Admittedly, *Adirondack Medical Center* notes a "broad grant of authority" under subsection (d)(5)(I)(i). 740 F.3d at 699. That case, however, did not involve a budget neutrality adjustment, and the Court did not evaluate the impact of subsection (d)(5)(I)(ii) on the interpretation of subsection (d)(5)(I)(i) nor the foregoing legislative and regulatory history suggesting that subsection (d)(5)(I) did not previously allow budget neutral changes to transfer policies.[11] In light of the plain text subsection (d)(5)(I) and its history, the Payment Reduction is an unauthorized budget neutrality adjustment and is not a lawful exercise of the Secretary's exceptions and adjustments authority.

## B.    The Secretary's Low Wage Index Redistribution and Payment Reduction Violate the APA.

This Court may also properly affirm the district court's grant of summary judgment for the Hospitals on the alternative grounds that the Secretary's action is

---

[11] Of course, the decision of the district court in *Shands Jacksonville Medical Center*, 139 F. Supp. 3d at 253, is not binding on this court. In any event, *Shands* was wrongly decided on this point. In order to give meaning to each clause of subsection (d)(5)(I), the Secretary's authority to adopt budget neutrality adjustments must be read as limited to adjustments for transfer cases.

arbitrary and capricious where he failed (a) to sufficiently explain the Low Wage

Index Redistribution and Payment Reduction and (b) to consider and respond to

significant comments.  *See E.E.O.C. v. Aramark Corp., Inc.*, 208 F.3d 266, 268

(D.C. Cir. 2000) ("[B]ecause we review the district court's judgment, not its

reasoning, we may affirm on any ground properly raised.").

        1.    <u>The Low Wage Index Redistribution and Payment Reduction Are Not</u>
<u>Rationally Explained.</u>

The APA and the Medicare Act prohibit the Secretary from taking actions

and making findings and conclusions that are arbitrary and capricious because they

are not explained, or not rationally explained.  5 U.S.C. § 706(2)(A); 42 U.S.C.

§ 1395hh(a); *see Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier*

*Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) ("The agency must cogently

explain why it has exercised its discretion in a given manner, and that explanation

must be sufficient to enable us to conclude that the agency's action was the product

of reasoned decisionmaking." (internal citations and quotes omitted)); *Conn. Light*

*& Power Co. v. Nuclear Regul. Comm'n.*, 673 F.2d 525, 528 (D.C. Cir. 1982)

("Disclosure of the agency's rationale is particularly important in order that a

reviewing court may fulfill its statutory obligation to determine whether the

agency's choice of rules was arbitrary or capricious.").

The Secretary offers incongruous explanations regarding the Low Wage

Index Redistribution and Payment Reduction.  The Secretary's stated rationales

offered in the FY 2020 rulemaking paradoxically swing from (a) increasing

payments to low wage index hospitals as a policy tool on the premise that low

wage index hospitals would use this as *an opportunity* to increase their wage-

related costs, to (b) intending to increase the accuracy of the wage index as a

technical adjustment.  *Compare* 84 Fed. Reg. at 42,326 (describing the policy as

"Providing an Opportunity for Low Wage Index Hospitals To Increase Employee

Compensation"), *with* 84 Fed. Reg. at 42,331 ("the intent of [the Low Wage Index

Redistribution] is to <u>increase the accuracy</u> of the wage index as a <u>technical</u>

<u>adjustment</u>, and not to use the wage index as a policy tool to address . . . the overall

financial health of hospitals in low wage areas or broader wage index reform.")

(emphasis added).

Taking the Secretary's latter proffered explanation first, introducing false

alterations to the highly technical wage index under the guise of making it "more

accurate" does not qualify as a rational explanation, and thus violates the APA:

"[I]t would seem to be the very definition of arbitrary and capricious for HHS to

knowingly use false facts when calculating hospital reimbursements."  *St. Francis*

*Med. Ctr. v. Azar*, 894 F.3d 290, 298 (D.C. Cir. 2018) (Kavanaugh, concurring).

The Secretary's inflation of wage index values distorted the wage index by

unevenly limiting the required relative differences in wage levels captured by the

wage index, and it cannot logically be defended as promoting accuracy or

rectifying data lag. *See supra*, pp. 29–33.

      With respect to the former explanation, the Secretary's prediction regarding

what hospitals will pay for labor with increased Medicare payments is both

irrelevant to the survey-driven wage index mandated by Congress and illogical.

The Secretary does not provide any rationale supporting his belief that hospitals

will increase wages above market rates (or are somehow operating while currently

paying under-market rates), does not identify any supporting studies or data, and

does not address his failure to adopt any mechanism to monitor or ensure that

benefitting hospitals increase wages.  As the Secretary noted, commenters

complained that they "reduce expenses in other areas to make up for" growth in

competitive labor costs.  84 Fed. Reg. at 19,394.  These commenters did not

indicate that current wages were below market or that inflated wage index values

increase employee compensation—rather, the logical extension of their comments

is that they would apply increased payments to non-labor costs where expenses had

been reduced.  The Secretary cannot rely on "speculative factual assertion[s]" to

support his policy, particularly when they run against real world observations.

*Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1266 (D.C. Cir. 1994) (quoting *Edison*

*Elec. Inst. v. U.S. E.P.A.*, 2 F.3d 438, 446 (D.C. Cir. 1993)); *see also Appalachian*

*Power Co. v. EPA*, 249 F.3d 1032, 1054 (D.C. Cir. 2001) (per curiam) (concluding

that the agency's growth factor determinations were arbitrary and capricious where the agency did not "address[] what appear to be stark disparities between its projections and real world observations.").

Because the Secretary has failed to provide a valid rationale for the Low Wage Index Redistribution and Payment Reduction, has considered factors that Congress did not ask him to consider, and failed to analyze the impact of economic factors which result in legitimate and justifiable disparities in the wage index between low and high wage hospitals, the Payment Reduction must be set aside.

2.    The Secretary Failed to Sufficiently Address Significant Comments.

Finally, the Payment Reduction is invalid and must be set aside under 5 U.S.C. § 706(2)(D) because the Secretary flatly failed to consider and respond to comments addressing specific limits on his exceptions and adjustments authority. In order to satisfy the APA's procedural requirements for notice-and-comment rulemaking, 5 U.S.C. § 553, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984)); *see also Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public."). Here, however, it is not clear

54

from the FY 2020 Final Rule, or from any other source provided by the Secretary,

that he considered the comments sufficiently.

> The Secretary summarized the relevant comments as follows:

>> With respect to our exceptions and adjustments authority under [42 U.S.C. § 1395ww(d)(5)(I)], these commenters stated— (1) this 'catchall' cannot be used in a manner that vitiates the language and purpose of the rest of the statute, including section [1395ww(d)(5)(A) through (H)], as there must be limits to the authority granted to CMS under this section; (2) CMS is not acting by regulation, and, therefore, is not following [subsection (d)(5)(I)]; and (3) if CMS does have the authority to make this change, this special authority is not required to be done in a budget neutral manner, as is clear from the statute where paragraph (d)(5)(I)(ii) references budget neutrality, but paragraph (d)(5)(I)(i) does not, and as is clear from relevant case law.

84 Fed. Reg. at 42,331. In response, however, the Secretary merely stated his

"belie[f that he] could use [his] broad authority under that provision to promulgate

such an adjustment" and wholly failed to address the asserted limitations on his

authority. 84 Fed. Reg. at 42,331. In failing to respond to significant stakeholder

comments challenging—with detailed argument—his authority to implement the

budget neutrality adjustment as an exception or adjustment under subsection

(d)(5)(I), the Secretary violated the APA's procedural requirement that he

"consider and respond to significant comments," *Mortg. Bankers Ass'n*, 575 U.S.

at 96, and the Payment Reduction must be set aside.

C.    **The District Court Erred in Failing to Vacate the Payment Reduction and Award Interest.**

1.    This Court Has Jurisdiction Over the Hospitals' Cross-Appeal.

Because this Court has jurisdiction to review the district court's July 27, 2022 Order by virtue of the Secretary's appeal (JA 89), it also has jurisdiction to consider the Hospitals' cross-appeal of the same order.  *See NAACP v. U.S. Sugar Corp.*, 84 F.3d 1432, 1436 (D.C. Cir. 1996).

This is not an appeal from a garden-variety civil judgment.  Although the Secretary's Notice of Appeal (JA 89) and the district court describe the order here as a "final, appealable order" (JA 88), a "remand order usually is not a final decision" for purposes of appellate review.  84 F.3d at 1436.  This rule "'best serves the interests of judicial economy and efficiency' because it 'avoids the prospect of entertaining two appeals, one from the order of remand and one from entry of a district court order reviewing the remanded proceedings.'"  *Pueblo of Sandia v. Babbitt,* 231 F.3d 878, 880 (D.C. Cir. 2000) (quoting *In re St. Charles Preservation Investors, Ltd.*, 916 F.2d 727, 729 (D.C. Cir. 1990)).  Nonetheless, the courts have recognized an exception permitting review of a remand order "where the agency to which the case is remanded seeks to appeal and it would have no opportunity to appeal after the proceedings on remand."  *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 330 (D.C. Cir. 1989) [hereinafter *Occidental*].  In

56

light of *Occidental* and its progeny, the Hospitals do not dispute the Secretary's assertion that this Court has jurisdiction to consider his appeal.

Once the requirements of the *Occidental* exception are met, this Court has jurisdiction to review the challenged order and may consider other parties' appeals from the same order. In *NAACP v. U.S. Sugar Corp.*, this Court addressed the impact of the *Occidental* exception on appeals brought by private parties where the remand order is also appealed by the government. 84 F.3d at 1436. After concluding that "the rule of *Occidental* gives us jurisdiction to hear the Department's appeal," the Court addressed the intervenor sugar cane growers' appeal. *Id*. Critically, this Court concluded that the government's appeal properly conferred jurisdiction to review the district court's order and address the growers' appeal from the same order. "[W]hat matters for the purposes of our appellate jurisdiction is whether the district court's decision—and not any particular party challenging it—is properly before us, which it is as a result of the Department's appeal. We therefore may also consider the growers' arguments against that decision." *Id.*; *see Cnty. of Los Angeles*, 192 F.3d at 1012 ("[V]ested with jurisdiction to review the Secretary's appeal under § 1291, we may also consider the Hospitals' cross-appeal of the district court's grant of summary judgment to the Secretary on their arbitrary and capricious agency-action claim. *See* [*NAACP v. U.S.*] *Sugar Corp.*, 84 F.3d at 1436.").

57

The approach laid out in *NAACP v. U.S. Sugar Corp.* is consistent with the efficiency-oriented rationales underlying the general rule that a remand order is not a final decision.  Allowing the government's appeal of a remand order to proceed under the *Occidental* exception while barring review of any other challenges to the same remand order would result in piecemeal appeals, to the detriment of judicial economy and efficiency.  *See Pueblo of Sandia*, 231 F.3d at 880.  Moreover, it would be inconsistent for a court to treat a particular remand order as "final" under 28 U.S.C. § 1291 with regard to the government's appeal, but to treat that same exact order as non-final with regard to other parties' appeals.

Importantly, the question of whether remand with vacatur is the proper remedy and whether interest should be awarded to the Hospitals is also intertwined with the merits of this case.  A reviewing court *shall* "hold unlawful *and set aside* agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C) (emphasis added).  Naturally, determining whether remand with vacatur is the proper remedy will require analyzing how an agency has acted in excess of its statutory authority—the merits analysis of this case.  Likewise, under 42 U.S.C. § 1395oo(f)(2), the reviewing court must award interest to the Hospitals as the prevailing party, an inquiry tied up with the merits of the Hospital's challenge.

Because the Hospitals and the Secretary are indisputably appealing *the same order*, this Court has jurisdiction to address both appeals and should do so to promote judicial efficiency.  Moreover, it is inconsistent with the structure of the district court's orders and the posture of the Secretary's appeal for him to now argue that his appeal of the July 27, 2022 order excludes the substance of that order in its entirety and only permits review of the earlier March 2, 2022 order.[12]

### 2.    The District Court Erroneously Failed to Vacate the Payment Reduction.

Because the district court concluded that the Secretary lacks the statutory authority to make the Payment Reduction funding the unlawful low wage index hospital policy, the Payment Reduction should be vacated, full stop.  *See Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy,* 706 F.3d 499, 509 (D.C. Cir. 2013) (vacating a regulatory definition adopted in excess of the agency's authority); *Humane Soc'y of U. S. v. Jewell,* 76 F. Supp. 3d 69, 137 (D.D.C. 2014) (vacating a rule that "falls outside the [agency's] statutory authority . . . and is predicated on an interpretation of the [Act] that is contrary to the statute's

---

[12] Notably, the district court and the Secretary have both characterized the remand order as a final, appealable order, a fact that this Court has found relevant in addressing its appellate jurisdiction in other administrative law cases.  *See Am. Great Lakes Ports Ass'n v. Schultz,* 962 F.3d 510, 515 (D.C. Cir. 2020) ("[I]t is relevant, although not dispositive, see *Limnia* [*Inc. v. U.S. Dep't of Energy*], 857 F.3d [379, 386 (D.C. Cir. 2017)], that the district court characterized its remand order as 'a final appealable Order.'").

purpose"), *aff'd sub nom. Humane Soc'y of the U.S. v. Zinke,* 865 F.3d 585, 614 (D.C. Cir. 2017).

Section 706(2) of the APA states in the clearest possible terms that a reviewing court *shall* "hold unlawful *and set aside* agency action" found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C) (emphasis added); *see Checkosky v. SEC,* 23 F.3d 452, 491 (D.C. Cir. 1994) (Randolph, J., writing separately) ("Setting aside means vacating; no other meaning is apparent."). Indeed, the D.C. Circuit has explained that "[v]acatur is the normal remedy," rather than a mere remand without vacatur. *Allina Health Servs. v. Sebelius,* 746 F.3d 1102, 1110–11 (D.C. Cir. 2014); *see also Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,* 429 F.3d 1136, 1151 (D.C. Cir. 2005) ("[U]nsupported agency action normally warrants vacatur . . . ."); *Humane Soc'y of the U.S. v. Zinke,* 865 F.3d 585, 614 (D.C. Cir. 2017) (describing vacatur as a "common remedy").

This Court permits remand without vacatur only in "certain limited circumstances," *EME Homer City Gen., L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015), that are generally confined to challenges involving procedural APA deficiencies that could be rehabilitated with further explanation or other agency action on remand. *E.g.*, *Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n,* 988 F.2d 146, 150–151 (D.C. Cir. 1993) (permitting remand without vacatur based on

60

a two-factor test where the justification for the challenged rule was "inadequately supported," thus creating the possibility that the agency could, on remand, "develop a reasoned explanation based on an alternative justification"); *Am. Great Lakes Ports*, 962 F.3d at 518–519 (applying the *Allied-Signal* test to determine the appropriate remedy for an agency's "failure to consider" certain factors); *Shands Jacksonville*, 959 F.3d at 1118 (addressing a challenge to "an inadequately supported rule . . . [where] an agency may be able to rehabilitate its rule on remand . . . ." under *Allied-Signal*); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019) (remanding where the agency "might be able to offer a satisfactory reason on remand"); *Stand Up for California! v. U.S. Dep't Interior*, 879 F.3d 1177, 1190 (D.C. Cir. 2018) (affirming remand without vacatur to address a procedural notice violation); *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860–61 (D.C. Cir. 2012) (addressing a challenge to "an inadequately explained agency action" under *Allied-Signal*); *Advocs. for Highway & Auto Safety*, 429 F.3d at 1151 (remanding an arbitrary and capricious agency action). No such rehabilitation is possible here because the Secretary's Payment Reduction exceeded his statutory authority.

Despite the clear instruction in 5 U.S.C. § 706(2)(C) and this Court's precedent, the district court erroneously applied the *Allied-Signal* two-factor test to conclude that remand without vacatur was warranted. JA 86–88. In reaching this

conclusion, the district court cited a subset of the D.C. Circuit authority recited above, while failing to acknowledge the absence of D.C. Circuit precedent authorizing remand without vacatur where the challenged agency action is found to be in excess of statutory authority. And, insofar as the district court cases cited include remand without vacatur in some cases involving challenged agency action in excess of statutory authority (JA 86–88), those cases that do not analyze *whether* the *Allied-Signal* factors *should* apply in cases involving agency action that exceeds statutory authority. *Id*. (citing *Citrus HMA, LLC v. Becerra*, No. CV 20-707 (CKK), 2022 WL 1062990 (D.D.C. Apr. 8, 2022); *Am. Hosp. Ass'n v. Azar*, No. CV 18-2841 (RMC), 2019 WL 5328814 (D.D.C. Oct. 21, 2019), *rev'd on other grounds*, 964 F.3d 1230 (D.C. Cir. 2020); *Am. Waterways Operators v. Wheeler*, 507 F. Supp. 3d 47, 75 (D.D.C. 2020); and *Stand Up for California! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1190 (D.C. Cir. 2018)).

Even if the district court did not err by applying the *Allied-Signal* test, it incorrectly assessed the second factor. The first *Allied-Signal* factor—the seriousness of the agency's action's deficiencies—is manifest and weighs in favor of vacatur in this case. The Secretary's Payment Reduction violated the Medicare Act, and "it is of course a serious deficiency if a regulation fails to comply with the applicable statute." JA 87. The second *Allied-Signal* factor, which looks at "the disruptive consequences of an interim change that may itself be changed," 988

62

F.2d at 150–51, likewise does not support remand without vacatur of the payment

reduction.  *See Comcast Corp. v. F.C.C.*, 579 F.3d 1, 9 (D.C. Cir. 2009) ("Of

course, the second *Allied–Signal* factor is weighty only insofar as the agency may

be able to rehabilitate its rationale for the regulation.").  Vacatur of the 0.2016%

Payment Reduction poses little risk of disruption as it eliminates a payment

reduction applied in *excess of legal authority* and does not constitute "an interim

change that may itself be changed," 988 F.2d at 150–51.  Established mechanisms

exist for the Secretary to make the Hospitals whole for FY 2020, and vacatur

would simply prompt such action rather than producing "disruption and

confusion."  JA 87.  Rather, vacatur of the Payment Reduction is the normal and

proper remedy.

### 3.    As the Undisputed Prevailing Parties, the Hospitals are Entitled to an Award of Interest under the Medicare Act.

Having found that the Secretary's artificial manipulation of the wage index

in FY 2020 violated the Medicare Act, the district court erred by failing to award

required litigation interest under the Medicare Act without explanation (JA 82–88).

The Medicare Act provides that "[w]here a provider seeks judicial review pursuant

to [42 U.S.C. § 1395oo(f)(1)], the amount in controversy shall be subject to annual

interest . . . to be awarded by the reviewing court in favor of the prevailing party."

42 U.S.C. § 1395oo(f)(2).  Thus, by the express terms of the statute, there are three

prerequisites for receiving litigation interest: (1) the provider must seek judicial

review of a determination of the Secretary pursuant to 42 U.S.C. § 1395oo(f)(1);

(2) there must be an amount in controversy; and (3) the provider must be the

"prevailing party" in the dispute.

As to the first criterion, there is no dispute that Hospitals timely challenged

the Secretary's determinations to reduce the inpatient hospital payment rates in the

FY 2020 Final Rule by 0.2016% and properly petitioned for expedited judicial

review, that the Board granted their petitions, and that they filed suit in the district

court within the requisite time, in accordance with 42 U.S.C. § 1395oo(f)(1).  As to

the second prong of the interest inquiry, when the Board granted the Hospitals'

petitions for expedited judicial review in each group appeal, the Board expressly

found that there was an "amount in controversy" that satisfied jurisdictional

requirements.  *See Tucson Med. Ctr. v. Sullivan,* 947 F.2d 971, 980 (D.C. Cir.

1991).  Indeed, the Board only has jurisdiction to hear an appeal if "the amount in

controversy is $10,000 or more," 42 U.S.C. § 1395oo(a)(2) (or in the case of a

group appeal under subsection (b), at least $50,000), and may "grant expedited

[judicial] review only after it first determines that the provider is entitled to a

hearing under § 1395oo(a) . . . ." *Id.*  Finally, the Hospitals plainly are prevailing

parties for purposes of § 1395oo(f)(2), a point that the Secretary conceded below.

Sec'y Br. Remedies at 13, No. 1:20-cv-01574 (D.D.C. May 9, 2022), ECF No. 32

("Defendant recognizes that plaintiffs are a 'prevailing party' for purposes of section 1395oo(f)(2)").

The district court, however, wholly failed to address the Hospitals request for an award of interest as the prevailing parties under 42 U.S.C. § 1395oo(f)(2). Because the statutory criteria are satisfied, Hospitals are entitled to interest "awarded by the reviewing court," and it was error to fail to enter such an award.

## IX. CONCLUSION

For the foregoing reasons, this Court should affirm in part and reverse in part the district court's judgment, vacate the FY 2020 0.2016% Payment Reduction funding the unlawful Low Wage Index Redistribution, award interest to the Hospitals as prevailing parties under 42 U.S.C. § 1395oo(f)(2), and remand to the Secretary for appropriate relief (*i.e.*, make-whole payments).

Dated:  May 3, 2023                          Respectfully submitted,

                                             _____/s/ Katrina Pagonis_____
                                             KATRINA A. PAGONIS
                                             HOOPER, LUNDY & BOOKMAN, P.C.
                                             44 Montgomery Street, Suite 3500
                                             San Francisco, CA 94104
                                             Tel.: (415) 875-8515
                                             Fax: (415) 986-2157
                                             E-mail:  kpagonis@hooperlundy.com

                                             KELLY A. CARROLL
                                             HOOPER, LUNDY & BOOKMAN, P.C.
                                             401 9th Street, N.W., Suite 550
                                             Washington, D.C.  20004-2141
                                             Tel.: (202) 580-7712

Fax: (202) 580-7719
Email:  kcarroll@hooperlundy.com

*Counsel for Appellees/Cross-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) because this brief contains 15,225 words, as determined by the word-count function of Microsoft Office 365 ProPlus, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 ProPlus in 14-point Times New Roman font.

By:      /s/ Katrina A. Pagonis
         Katrina A. Pagonis

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of May, 2023, I electronically filed the Brief for Appellees/Cross-Appellants with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By:    /s/ Katrina A. Pagonis
          Katrina A. Pagonis

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

5 U.S.C. § 706...........................................................................................A1

42 U.S.C. § 1395oo(f)...............................................................................A2

42 U.S.C. § 1395ww(d)(3)(A)(VI) ............................................................A3

42 U.S.C. § 1395ww(d)(3)(E)....................................................................A3

42 U.S.C. § 1395ww(d)(5)(I).....................................................................A5

Social Security Act Amendments of 1994, Pub. L. 103-432, § 109, 108 Stat.
    4398, 4408 (1994)............................................................................A6

Transitional Medical Assistance, Abstinence Education, and QI Programs
    Extension Act of 2007, Pub. L. No. 110–90, § 7(b)(1), 121 Stat. 984,
    986 (2007)........................................................................................A6

42 C.F.R. § 412.64(h) ...............................................................................A7

**5 U.S.C. § 706**

*§ 706. Scope of review*

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>> (B) contrary to constitutional right, power, privilege, or immunity;

>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>> (D) without observance of procedure required by law;

>> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

>> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**42 U.S.C. § 1395oo**

*§ 1395oo(f).  Finality of decision; judicial review; determinations of Board authority; jurisdiction; venue; interest on amount in controversy.*

(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5 notwithstanding any other provisions in section 405 of this title. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

(2) Where a provider seeks judicial review pursuant to paragraph (1), the amount in controversy shall be subject to annual interest beginning on the first day of the first month beginning after the 180-day period as determined pursuant to subsection (a)(3) and equal to the rate of interest on obligations issued for purchase by the Federal Hospital Insurance Trust Fund for the month in which the civil action authorized under paragraph (1) is commenced, to be awarded by the reviewing court in favor of the prevailing party.

(3) No interest awarded pursuant to paragraph (2) shall be deemed income or cost for the purposes of determining reimbursement due providers under this chapter.

## 42 U.S.C. § 1395ww

### § 1395ww(d)(3)(A)(vi).

(vi) Insofar as the Secretary determines that the adjustments under paragraph (4)(C)(i) for a previous fiscal year (or estimates that such adjustments for a future fiscal year) did (or are likely to) result in a change in aggregate payments under this subsection during the fiscal year that are a result of changes in the coding or classification of discharges that do not reflect real changes in case mix, the Secretary may adjust the average standardized amounts computed under this paragraph for subsequent fiscal years so as to eliminate the effect of such coding or classification changes.

## 42 U.S.C. § 1395ww

### § 1395ww(d)(3)(E).  Adjusting for different area wage levels.

(E) Adjusting for different area wage levels.—

(i) In general.—Except as provided in clause (ii), (iii), or (iv), the Secretary shall adjust the proportion, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages and wage-related costs, of the DRG prospective payment rates computed under subparagraph (D) for area differences in hospital wage levels by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level. Not later than October 1, 1990, and October 1, 1993 (and at least every 12 months thereafter), the Secretary shall update the factor under the preceding sentence on the basis of a survey conducted by the Secretary (and updated as

appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States.  Not less often than once every 3 years the Secretary (through such survey or otherwise) shall measure the earnings and paid hours of employment by occupational category and shall exclude data with respect to the wages and wage-related costs incurred in furnishing skilled nursing facility services.  Any adjustments or updates made under this subparagraph for a fiscal year (beginning with fiscal year 1991) shall be made in a manner that assures that the aggregate payments under this subsection in the fiscal year are not greater or less than those that would have been made in the year without such adjustment. The Secretary shall apply the previous sentence for any period as if the amendments made by section 403(a)(1) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, the amendments made by section 10324(a)(1) of the Patient Protection and Affordable Care Act, and the amendments made by section 9831(a) of the American Rescue Plan Act of 2021 had not been enacted.

(ii) Alternative proportion to be adjusted beginning in fiscal year 2005.—For discharges occurring on or after October 1, 2004, the Secretary shall substitute ''62 percent'' for the proportion described in the first sentence of clause (i), unless the application of this clause would result in lower payments to a hospital than would otherwise be made.

(iii) Floor on area wage index for hospitals in frontier states.—

> (I) In general.—Subject to subclause (IV), for discharges occurring on or after October 1, 2010, the area wage index applicable under this subparagraph to any hospital which is located in a frontier State (as defined in subclause (II)) may not be less than 1.00.

> (II) Frontier state defined.—In this clause, the term ''frontier State'' means a State in which at least 50 percent of the counties in the State are frontier counties.

> (III) Frontier county defined.—In this clause, the term ''frontier county'' means a county in which the population per square mile is less than 6.

> (IV) Limitation.—This clause shall not apply to any hospital located in a State that receives a non-labor related share adjustment under paragraph (5)(H).

(iv) Floor on area wage index for hospitals in all-urban states.—

(I) In general.—For discharges occurring on or after October 1, 2021, the area wage index applicable under this subparagraph to any hospital in an all-urban State (as defined in subclause (IV)) may not be less than the minimum area wage index for the fiscal year for hospitals in that State, as established under subclause (II).

(II) Minimum area wage index.—For purposes of subclause (I), the Secretary shall establish a minimum area wage index for a fiscal year for hospitals in each all-urban State using the methodology described in section 412.64(h)(4)(vi) of title 42, Code of Federal Regulations, as in effect for fiscal year 2018.

(III) Waiving budget neutrality.—Pursuant to the fifth sentence of clause (i), this clause shall not be applied in a budget neutral manner.

(IV) All-urban state defined.—In this clause, the term ''all-urban State'' means a State in which there are no rural areas (as defined in paragraph (2)(D)) or a State in which there are no hospitals classified as rural under this section.

## 42 U.S.C. § 1395ww

### *§ 1395ww(d)(5)(I).*

(I)    (i) The Secretary shall provide by regulation for such other exceptions and adjustments to such payment amounts under this subsection as the Secretary deems appropriate.

(ii) In making adjustments under clause (i) for transfer cases (as defined by the Secretary) in a fiscal year, not taking in account the effect of subparagraph (J), the Secretary may make adjustments to each of the average standardized amounts determined under paragraph (3) to assure that the aggregate payments made under this subsection for such fiscal year are not greater or lesser than those that would have otherwise been made in such fiscal year.

**Social Security Act Amendments of 1994, Pub. L. 103-432, § 109, 108 Stat. 4398, 4408 (1994).**

*Sec. 109. Authority for budget neutral adjustments for Changes in payment amounts for transfer cases.*

Section 1886(d)(5)(I) (42 U.S.C. 1395ww(d)(5)) is amended—

(1) by inserting "(i)" after "(I)"; and

(2) by adding at the end the following new clause:

"(ii) In making adjustments under clause (i) for transfer cases (as defined by the Secretary) in a fiscal year, the Secretary may make adjustments to each of the average standardized amounts determined under paragraph (3) to assure that the aggregate payments made under this subsection for such fiscal year are not greater or lesser than those that would have otherwise been made in such fiscal year,".

**Transitional Medical Assistance, Abstinence Education, and QI Programs Extension Act of 2007, Pub. L. No. 110–90, § 7(b)(1), 121 Stat. 984, 986 (2007).**

*Sec. 7(b). Limitation on implementation for fiscal years 2008 and 2009 of a prospective documentation and coding adjustment in response to the implementation of the Medicare severity diagnosis related group (MS–DRG) system under the Medicare prospective payment system for inpatient hospital services.*

(b) Subsequent adjustments.—

(1) In general.—Notwithstanding any other provision of law, if the Secretary determines that implementation of such Medicare Severity Diagnosis Related Group (MS–DRG) system resulted in changes in coding and classification that did not reflect real changes in case mix under section 1886(d) of the Social Security Act (42 U.S.C. 1395ww(d)) for discharges occurring during fiscal year 2008 or 2009 that are different than the prospective documentation and coding adjustments applied under subsection (a), the Secretary shall—

(A) make an appropriate adjustment under paragraph (3)(A)(vi) of such section 1886(d); and

A6

(B) make an additional adjustment to the standardized amounts under such section 1886(d) for discharges occurring only during fiscal years 2010, 2011, and 2012 to offset the estimated amount of the increase or decrease in aggregate payments (including interest as determined by the Secretary) determined, based upon a retrospective evaluation of claims data submitted under such Medicare Severity Diagnosis Related Group (MS–DRG) system, by the Secretary with respect to discharges occurring during fiscal years 2008 and 2009.

## 42 C.F.R. § 412.64

### *§ 412.64(h). Adjusting for different area wage levels.*

(h) Adjusting for different area wage levels. CMS adjusts the proportion of the Federal rate for inpatient operating costs that are attributable to wages and labor-related costs for area differences in hospital wage levels by a factor (established by CMS based on survey data) reflecting the relative level of hospital wages and wage-related costs in the geographic area (that is, urban or rural area as determined under the provisions of paragraph (b) of this section) of the hospital compared to the national average level of hospital wages and wage-related costs. The adjustment described in this paragraph (h) also takes into account the earnings and paid hours of employment by occupational category.

(1) The wage index is updated annually.

(2) CMS determines the proportion of the Federal rate that is attributable to wages and labor-related costs from time to time, employing a methodology that is described in the annual regulation updating the system of payment for inpatient hospital operating costs.

(3) For discharges occurring on or after October 1, 2004, CMS employs 62 percent as the proportion of the rate that is adjusted for the relative level of hospital wages and wage-related costs, unless employing that percentage would result in lower payments for the hospital than employing the proportion determined under the methodology described in paragraph (h)(2) of this section.

(4) For discharges on or after October 1, 2004 and before October 1, 2018, and for discharges on or after October 1, 2021, CMS establishes a minimum wage index for each all-urban State, as defined in paragraph (h)(5) of this

A7

section. This minimum wage index value is computed using the following methodology:

(i) CMS computes the ratio of the lowest-to-highest wage index for each all-urban State;

(ii) CMS computes the average of the ratios of the lowest-to-highest wage indexes of all the all-urban States;

(iii) For each all-urban State, CMS determines the higher of the State's own lowest-to-highest rate (as determined under paragraph (h)(4)(i) of this section) or the average lowest-to-highest rate (as determined under paragraph (h)(4)(ii) of this section);

(iv) For each State, CMS multiplies the rate determined under paragraph (h)(4)(iii) of this section by the highest wage index value in the State;

(v) The product determined under paragraph (h)(4)(iv) of this section is the minimum wage index value for the State, except as provided under paragraph (h)(4)(vi) of this section;

(vi) For discharges on or after October 1, 2012 and before October 1, 2018, and for discharges on or after October 1, 2021, the minimum wage index value for the State is the higher of the value determined under paragraph (h)(4)(iv) of this section or the value computed using the following alternative methodology:

(A) CMS estimates a percentage representing the average percentage increase in wage index for hospitals receiving the rural floor due to such floor.

(B) For each all-urban State, CMS makes a onetime determination of the lowest hospital wage index in the State (including all adjustments to the hospital's wage index, except for the rural floor, the rural floor budget neutrality, and the outmigration adjustment) and increases this wage index by the percentage determined under paragraph (h)(4)(vi)(A) of this section, the result of which establishes the alternative minimum wage index value for the State.

(vii) For discharges on or after October 1, 2021, the minimum wage index computed under this paragraph must not be applied in a budget neutral manner.

(5)    (i) For purposes of paragraph (h)(4) of this section, for discharges on or after October 1, 2004 and before October 1, 2018, an all-urban State is a State with no rural areas, as defined in this section, or a State in which there are no hospitals classified as rural. For purposes of this definition, a State with rural areas and with hospitals reclassified as rural under § 412.103 is not an all-urban State.

(ii) For purposes of paragraph (h)(4) of this section, for discharges on or after October 1, 2021, an all-urban State is a State with no rural areas, as defined in this section, or a State in which there are no hospitals classified as rural under section 1886 of the Act. For purposes of this definition, a hospital is classified as rural under section 1886 of the Act if it is assigned the State's rural area wage index value.

(6) If a new rural hospital that is subject to the hospital inpatient prospective payment system opens in a State that has an imputed rural floor and has rural areas, CMS uses the imputed floor as the hospital's wage index until the hospital's first cost report as an inpatient prospective payment system provider is contemporaneous with the cost reporting period being used to develop a given fiscal year's wage index.

(7) Beginning with fiscal year 2023, if CMS determines that a hospital's wage index value for a fiscal year would decrease by more than 5 percent as compared to the hospital's wage index value for the prior fiscal year, CMS limits the decrease to 5 percent for the fiscal year.